2012 Ark. App. 575

Nina GUTIERREZ, Appellant

v.

ARKANSAS DEPARTMENT OF HUMAN SERVICES and Minor Children, Appellees.

No. CA 12–466.

Court of Appeals of Arkansas.

Oct. 10, 2012.

Deborah R. Sallings, Little Rock, Arkansas Public Defender Commission, for appellant.

Tabitha B. McNulty, Office of Chief Counsel, for appellee.

Chrestman Group, PLC, by: Keith L. Chrestman, attorney ad litem for minor children.

DOUG MARTIN, Judge.

Appellant Nina Gutierrez appeals from the Lonoke County Circuit Court's termination of her parental rights to her two sons, A.A. (DOB: 2–5–02) and A.G. (DOB: 1–31–06). Gutierrez argues that there was insufficient evidence to support the termination.[1] We disagree and affirm.

On July 26, 2010, police executed a search warrant on Gutierrez's home, and she and her boyfriend were arrested on charges of maintaining a drug premises, possession of marijuana with intent to deliver, and possession of drug paraphernalia. The children, A.A. and A.G., were taken into custody by the Arkansas Department of Human Services (DHS), and an order for emergency custody was entered July 28, 2010. On August 2, 2010, the trial court found probable cause that the emergency conditions necessitating the children's removal continued and that it was contrary to the children's welfare to be returned to Gutierrez's custody.

A.A. and A.G. were adjudicated dependent-neglected on September 7, 2010, based on the trial court's finding that the children were in danger of severe child maltreatment due to marijuana being used and sold in Gutierrez's home. The goal was reunification, and the trial court ordered DHS to develop a case plan and provide services to Gutierrez.

On November 29, 2010, a review order indicates that DHS had made reasonable efforts to provide the following services: visitation, counseling, medical care, foster care, PACE (Project for Adolescent and Child Evaluation) evaluation, family social worker visits, parenting classes, random drug screens, transportation, referral for drug assessment, daycare, and comprehensive evaluation. The trial court found that Gutierrez had partially complied with the case plan but had not provided documentation of her attendance at Alcoholics Anonymous/Narcotics Anonymous (AA/NA) meetings. Following a random drug screen on October 7, 2010, Gutierrez tested negative for all substances; however, on October 28, 2010, Gutierrez tested positive for methamphetamine.

Another review hearing was held on April 5, 2011, and the trial court found that, in addition to the services provided, DHS had made a referral for individual counseling, drug-and-alcohol assessment, and psychological evaluation. The trial court found that, while Gutierrez had attended visitation with her children, submitted to random drug screens, and maintained stable housing and employment, she had not completed a drug-and-alcohol assessment, attended individual counseling, undergone a psychological evaluation, or provided documentation from AA/NA meetings.

On June 7, 2011, a review hearing was held, and the trial court found that Gutierrez had attended visitation, submitted to random drug screens, maintained stable housing and employment, undergone a psychological evaluation, and attended counseling and AA/NA meetings.

At a permanency planning hearing held on July 5, 2011, the trial court continued the goal of reunification. The trial court found that, although DHS had made a

---

1. The trial court also terminated the parental rights of the boys' father, but he is not a party to this appeal.

referral for a drug-and-alcohol assessment, an appointment date and time had not been received. The trial court also noted that DHS had a difficult time administering random drug screens and thus ordered Gutierrez to submit to a hair-follicle drug test.

A review hearing was held on August 3, 2011, and the trial court found that Gutierrez had refused to submit to a hair-follicle drug test. Gutierrez was again ordered to submit to the test.

At the fifteen-month review hearing on September 6, 2011, the trial court found that Gutierrez had not complied with the case plan in that she still had not taken the hair-follicle drug test and only recently completed a drug-and-alcohol assessment. The trial court allowed Gutierrez another opportunity to take the hair-follicle drug test. Moreover, the trial court granted DHS's request to give Gutierrez an additional thirty days to comply based on DHS's report that the children were very attached to their mother.

On October 11, 2011, DHS and an attorney ad litem for the minor children filed a joint petition for termination of Gutierrez's parental rights.

A second permanency planning hearing was held on October 14, 2011, and the trial court found that Gutierrez had not complied with the case plan, in that she tested positive for methamphetamine on a drug screen administered September 7, 2011, and, when Gutierrez finally submitted to the hair-follicle drug test on September 22, 2011, it was positive for methamphetamine. The trial court thus changed the goal of the case from reunification to adoption.

A termination hearing was held on January 31, 2012. Family service worker Lakisha Tatum was assigned to Gutierrez's case in January 2011. Tatum conceded that DHS had gotten off to a bad start

with Gutierrez's drug-and-alcohol assessment. Gutierrez's initial drug-and-alcohol assessment was scheduled to occur in December 2010, but it was canceled because Gutierrez had a court appearance. Tatum testified that she made a second referral for an assessment in March 2011 and that, although she later discovered that the assessment had been scheduled, Tatum did not receive notice. As a result, Gutierrez's drug-and-alcohol assessment was not completed until August 24, 2011. With regard to the hair-follicle drug test, Tatum testified that Gutierrez refused the tests scheduled in July and August, citing concerns with the test about which she wanted to speak with her lawyer. When Gutierrez finally took the hair-follicle drug test on September 22, 2011, it was positive for methamphetamine. Tatum noted that, in January 2011 when she was assigned to the case, Gutierrez had also tested positive for methamphetamine. Tatum stated that, prior to the positive drug screen in September 2011, Gutierrez had unsupervised visitation on weekends and overnight visits with her children and that the case was proceeding toward a trial placement in Gutierrez's home. Tatum testified that Gutierrez completed parenting classes, had a job working for her father, maintained stable housing, resolved her legal issues in that she had received probation, submitted to some random drug screens, and completed individual counseling. Tatum testified that, although Gutierrez submitted to a psychological evaluation, she had not followed through with the recommendations. Tatum testified that Gutierrez had not continuously and regularly visited her children and had missed some visits. Tatum testified that there were times that Gutierrez appeared unannounced at the foster parents' home on a different day than that on which she was scheduled to visit her children. According to Tatum, Gutierrez's anger got in the way of her participating

with the case plan, and Gutierrez did not show a genuine interest in complying until the very end when the goal was changed to adoption. While Tatum testified that it was her opinion that Gutierrez could care for her children at the time of the termination hearing, Tatum recommended termination of Gutierrez's parental rights because the children needed permanency. Tatum testified that she did not believe there would be a problem finding adoptive parents for the children because they were "young, smart, intelligent, very lovable" but that, to her knowledge, no potential families had expressed interest in adopting them thus far.

Wendy Founds, Gutierrez's outpatient counselor at Little Rock Outreach, read a letter written by her supervisor Kelly Steed, a CADC (Certified Alcohol and Drug Counselor): "To whom it may concern: Ms. Nina Gutierrez entered into the ATR grant program on August 24, 2011. She was assessed for ADD on September 20, 2011. Ms. Gutierrez complied with the treatment plan to date. Client has had one relapse but has embraced recovery since that time. Ms. Gutierrez had participated fully in both her treatment and in her recovery community. . . ." Founds testified that Gutierrez signed up for drug treatment on August 24, 2011, but that actual treatment was not available in Gutierrez's area until September 20, 2011. According to Founds, the hair-follicle drug test was "kind of a reality opening-her-eyes-up type situation" for Gutierrez. Founds testified that, while Gutierrez initially denied having a drug problem, in December 2011, Gutierrez said, "Who am I kidding that I don't have a drug problem when my children that I love with all my heart are in custody and I just failed a hair

follicle test?" Founds testified that Gutierrez had suffered a relapse during her treatment but that it was not uncommon among methamphetamine users. According to Founds, Gutierrez had missed two meetings, but they were excused absences. Founds stated that Gutierrez attended outpatient group meetings once a week but had been going twice a week for the previous three weeks. Founds testified that, since December, Gutierrez's compliance level "has been absolutely 110 percent. I wish all of my clients were that way." Founds testified that Gutierrez should continue outpatient treatment for the next thirty to forty-five days but should continue classes for two or three more years.

Gutierrez testified that she first used methamphetamine in November 2010, after her children had been taken into custody by DHS. Gutierrez further admitted using methamphetamine in December 2010, January 2011, August 2011, and three times in September 2011. Gutierrez testified that she was being honest about her drug usage, even though DHS could prove only two failed drug tests. Gutierrez stated that she should have taken the initial hair-follicle drug test because she was "clean" at that time.[2] Gutierrez testified that she refused to take the test in July 2011 because she "hadn't touched base" with her attorney about whether the test would show her previous marijuana use and refused the test in August 2012 because she was "dirty" by then. Gutierrez stated that she used methamphetamine because of pressure, stress, and bad decisions and because she did not address her original problem, which was marijuana. Gutierrez also claimed that she "screwed up" because she

2.  Citing information obtained from the internet, Gutierrez alleges in her brief that methamphetamine can be detected in urine up to six days after use, while a hair-follicle drug test can measure methamphetamine usage up to ninety days.

was "just dealing with the kids not being there."

According to Gutierrez, she began attending group AA/NA meetings in August 2010 but they did not help in the beginning; however, she stated that "the more you go, the more it works." Gutierrez testified that she was going to group meetings twice a week but that now she goes to six out of seven meetings per week. As a condition of her probation in January 2011, Gutierrez attended "ACTS" classes, a program for drug dependency, but "kind of dropped it" when she found Little Rock Outreach, which she thought was a better program and more convenient. Gutierrez testified that she contacted Little Rock Outreach after she failed the hair-follicle drug test and sought help when "I realized what was on the line and what I was jeopardizing." Gutierrez testified that she did not seek help before because she did not realize she had a drug problem. Gutierrez testified that Little Rock Outreach had helped her and was "a good thing" and that she probably would have "been in better shape" had she received a drug-and-alcohol assessment before August 2011. Gutierrez testified that, regardless of the assessment, she was receiving help with her drug addiction before September 2011. Gutierrez testified that she was not motivated to attend meetings for her drug addiction until the goal of the case was changed to adoption. Gutierrez testified that she was now making better choices and that "my kids come first."

At the conclusion of the hearing, the trial court terminated Gutierrez's parental rights, noting that Gutierrez began taking methamphetamine after she had received increased visitation with her children and that Gutierrez admitted that she did not take the case seriously until the case had progressed to termination of her parental

rights. The judge ruled that "[t]he eleventh hour is too late."

In the order terminating Gutierrez's parental rights entered March 7, 2012, the trial court found that Gutierrez had failed to fully participate in and was not compliant with the case plan and did not abide by the court's orders. The trial court granted the joint petition for termination on the ground

> that a juvenile has been adjudicated by the court to be dependent-neglected and has continued to be out of the custody of the parent for twelve (12) months and, despite a meaningful effort by the department to rehabilitate the parent and correct the conditions that caused removal, those conditions have not been remedied by the parent.

Ark.Code Ann. § 9–27–341(b)(3)(B)(i)(*a*) (Supp.2011). The trial court specifically found that, "The conditions which caused the juveniles to come into care have not been remedied. Nina Gutierrez did not admit that she had a problem with drugs until the very end of the case, at the end of the 12 months. It was not until then that she was [sic] started the treatment and counseling that should have begun at the beginning of this case." The trial court concluded that termination of parental rights was in the children's best interest, considering the potential harm they faced if returned to Gutierrez's custody. Specifically, the trial court found that Gutierrez was "not a fit and proper parent" and "does not have an appropriate lifestyle." The trial court further found that the children were very likely to be adopted, based on the credible testimony of the caseworker. Gutierrez filed a timely notice of appeal.

Termination of parental rights is an extreme remedy in derogation of the natural rights of the parents. *Wright v. Ark.Dep't of Human Servs.*, 83 Ark.App. 1,

115 S.W.3d 332 (2003). Nevertheless, parental rights will not be enforced to the detriment or destruction of the health and well-being of the child. *Id.* We review cases involving the termination of parental rights de novo. *Anderson v. Ark. Dep't of Human Servs.*, 2011 Ark. App. 526, 385 S.W.3d 373. Pursuant to Arkansas Code Annotated section 9–27–341(b)(3), the facts warranting termination of parental rights must be proved by clear and convincing evidence. Clear and convincing evidence is the degree of proof that will produce in the fact-finder a firm conviction regarding the allegation sought to be established. *Wright, supra.* When the burden of proving a disputed fact is by clear and convincing evidence, the question on appeal is whether the circuit court's finding that the disputed fact was proved by clear and convincing evidence is clearly erroneous, giving due regard to the opportunity of the circuit court to judge the credibility of the witnesses. *Anderson, supra.* A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Hopkins v. Ark. Dep't of Human Servs.*, 79 Ark.App. 1, 83 S.W.3d 418 (2002). We have noted that in matters involving the welfare of young children, we will give great weight to the trial judge's personal observations. *Cobbs v. Ark. Dep't of Human Servs.*, 87 Ark.App. 188, 189 S.W.3d 487 (2004).

■ The termination of parental rights is a two-step process that requires the circuit court to find that the parent is unfit and that termination is in the best interest of the child. *Welch v. Ark. Dep't of Human Servs.*, 2010 Ark.App. 798, 378 S.W.3d 290. The first step requires consideration of whether the termination of parental rights is in the child's best interest. Ark.Code Ann. § 9–27–341(b)(3)(A). This includes consideration of the likelihood that the juvenile will be adopted and the potential harm caused by returning custody of the child to the parent. Ark.Code Ann. § 9–27–341(b)(3)(A)(i), (ii). The second step requires proof of one or more of the statutory grounds for termination. Ark.Code Ann. § 9–27–341(b)(3)(B).

■ Gutierrez first challenges the grounds supporting the termination of her parental rights. Gutierrez contends that, while she admittedly "messed up" in the middle of the case, she had remedied the conditions that caused removal, "as much as anyone addicted to drugs can." Gutierrez argues that her compliance overall was remarkable and that the only problem was her initial denial that she had a drug problem, "which was only an issue from about June 2011 to August of that same year." Gutierrez argues that, in the six-month period prior to the termination hearing, she was in full compliance. Gutierrez maintains that "this is a family for which there is still hope" and that the trial court was speculating that she would fail in her recovery efforts. Gutierrez asserts that, in the face of all her other accomplishments, her decision to use methamphetamine again was simply a lapse in judgment. We cannot agree.

Considering that Gutierrez admitted using methamphetamine three times in September 2011, her drug problem was indeed still "an issue" and she was not in full compliance with the case plan for six months prior to the termination hearing in January 2012. In any event, section (a)(4)(A) provides that a parent's resumption of contact or overtures toward participating in the case plan or following the orders of the court following the permanency planning hearing and preceding the termination of parental rights hearing is an insufficient reason to not terminate parental rights. Gutierrez had two perma-

nency planning hearings, the first on July 5, 2011, and the second on October 14, 2011. The termination hearing was held on January 31, 2012, and Gutierrez admitted that she did not take the case seriously until after the goal had been changed to adoption following the second permanency planning hearing.

Nevertheless, the court shall rely upon the record of the parent's compliance in the entire dependency-neglect case and evidence presented at the termination hearing in making its decision whether it is in the juvenile's best interest to terminate parental rights. Ark.Code Ann. § 9–27–341(a)(4)(B). The evidence before the trial court was that Gutierrez's children came into DHS custody due to her arrest for drug-related offenses. Gutierrez's drug problem began with marijuana and, *after* her children had been removed from her custody for several months, Gutierrez chose to use methamphetamine, which only exacerbated her existing drug problem. DHS did not arrange for Gutierrez's drug assessment until August 2011, but Gutierrez admits in her brief that she resisted DHS's prior efforts to complete the assessment and does not argue on appeal that DHS failed to provide appropriate services to address her drug addiction. In fact, Gutierrez testified that she had received help for her drug addiction. Although Gutierrez appeared to be getting her life in order by the time of the termination hearing, we cannot say that the trial court, in considering Gutierrez's overall compliance with the case plan and court orders, clearly erred in finding sufficient grounds for termination of Gutierrez's parental rights.

■ Next, Gutierrez argues that the trial court erred in its best-interest analysis. Our appellate courts have noted that, in considering the best interest of the child, there is no requirement that every factor considered be established by clear and convincing evidence; rather, after consideration of all factors, the evidence must be clear and convincing that termination is in the best interest of the child. *Renfro v. Ark. Dep't of Human Servs.*, 2011 Ark. App. 419, 385 S.W.3d 285.

Regarding adoptability, Gutierrez argues that the caseworker who testified that the children were adoptable was not an adoption specialist and that no potential family had expressed any interest in adopting the children. To the extent Gutierrez challenges Tatum's qualifications to assess the likelihood that the children would be adopted, we note that this court has previously held that testimony from a caseworker *or* an adoption specialist that the children were adoptable is sufficient. *Thompson v. Ark. Dep't of Human Servs.*, 2012 Ark. App. 124, 2012 WL 386762. Tatum testified that, while no potential adoptive parents had been identified *thus far,* she saw no impediment to finding the two boys a home because they were both "young, smart, intelligent, very lovable." The trial court properly considered this evidence in concluding that the children were "very likely to be adopted."

With respect to potential harm, Gutierrez argues that her lifestyle had clearly changed since the children were removed from her custody. Gutierrez notes that Tatum testified that Gutierrez was capable of caring for her children. According to Gutierrez, there were no other issues signaling any potential harm to her children, such as inadequate housing or income, poor parenting skills, inappropriate visits, or poor care of the children.

■ The circuit court is not required to affirmatively identify a potential harm or to find that actual harm would result if the child were returned to the parent; rather, the potential-harm evidence must be viewed in a forward-looking manner and considered in broad terms. *Anderson, su-*

*pra.* Gutierrez began using methamphetamine *after* her children were taken into custody by DHS and continued abusing drugs for over twelve months during the course of the case plan. As noted above, Gutierrez admittedly did not take the dependency-neglect case and her drug addiction seriously until after the goal of the case was changed from reunification to adoption. While it is true that Tatum testified that she believed Gutierrez was capable of caring for her children at the time of the termination hearing, Tatum also recommended to the court that Gutierrez's parental rights be terminated because the children needed permanency. The trial court properly considered the potential harm to these children in light of this evidence.

Under these circumstances, we cannot say that the trial court clearly erred in its determination that it was in the children's best interest to terminate Gutierrez's parental rights.

Affirmed.

VAUGHT, C.J., and GLOVER, J., agree.