N. MARK KLAPPENBACH, Judge
This is an appeal from the order entered on June 26, 2017, by the Sebastian County Circuit Court terminating the parental rights of appellant Tara Lazaravage to her daughter GL, born in January 2016. Tara presents two points on appeal, asserting that the trial court committed reversible error (1) by not requiring compliance with the notice provisions of the Indian Child Welfare Act (ICWA) and (2) by clearly erring in finding that the Department of Human Services (DHS) proved any of the three alleged statutory grounds *452 to support terminating her parental rights. We affirm.
The termination of parental rights involves a two-step process in which the trial court must find that the parent is unfit and that termination is in the child's best interest. Brabon v. Ark. Dep't of Human Servs. , 2012 Ark. App. 2, 388 S.W.3d 69. An order terminating parental rights must be based on clear and convincing evidence, i.e., proof that will produce in the fact-finder a firm conviction as to the verity of the allegation sought to be established. Hamman v. Ark. Dep't of Human Servs. , 2014 Ark. App. 295, 435 S.W.3d 495. On appeal, the issue before us is whether the trial court's finding that the fact was proved by clear and convincing evidence is clearly erroneous. Id. A finding is clearly erroneous when the appellate court is, on the entire evidence, left with a definite and firm conviction that a mistake has been made. Id. In deciding whether a trial court's finding is clearly erroneous, we give great deference to its superior opportunity to observe the parties and to judge the credibility of witnesses. Id.
DHS alleged three statutory grounds against Tara to support terminating her parental rights: (1) the "failure to remedy" ground, Arkansas Code Annotated section 9-27-341(b)(3)(B)(i)(a ) (Supp. 2017); (2) the "aggravated circumstances" ground, Arkansas Code Annotated section 9-27-341(b)(3)(B)(ix)(a )(3 ) ; and (3) the "subsequent other factors or issues" ground, Arkansas Code Annotated section 9-27-341(b)(3)(B)(vii)(a ). Tara challenges the trial court's finding that clear and convincing evidence supported any of these three grounds, although only one ground is necessary to sustain an order terminating parental rights. Vail v. Ark. Dep't of Human Servs. , 2016 Ark. App. 150, 486 S.W.3d 229.
In determining the best interest of the juvenile, a trial court must take into consideration (1) the likelihood that the juvenile will be adopted if the termination petition is granted; and (2) the potential harm, specifically addressing the effect on the health and safety of the child, caused by returning the child to the custody of the parent. Myers v. Ark. Dep'tof Human Servs. , 2011 Ark. 182, 380 S.W.3d 906. Tara does not contest the trial court's "best interest" finding.
With these legal principles in mind, we examine the evidence presented in this case. GL was brought into emergency DHS custody shortly after her birth in January 2016, based on allegations that Tara was acting erratically, exhibiting dramatic mood swings, and making statements about hurting GL. Tara had tested positive for amphetamines, and hospital staff thought she was in psychosis. GL tested positive for methamphetamine at birth. Tara admitted that she was essentially homeless, having lived in a tent city and various people's homes prior to giving birth to GL. She identified two men as possibly being GL's father, one of whom she accused of domestic violence.
A probable-cause order was entered in January 2016. DHS was ordered to provide Tara with twice-weekly supervised visitation with GL and also to develop an appropriate case plan. The probable-cause order recited that Tara indicated that it was "possible" that she or GL might be of Indian heritage. The probable-cause order then provided as follows:
[Tara] is to provide [DHS] with complete names, maiden names and dates of relatives/ancestors who are members of or eligible for membership in an Indian Tribe. [DHS] has provided the mother with a "family tree" form in open court. She may use this form or otherwise convey the requested information to [DHS], but she is to do so forthwith.
*453 Upon receipt of information[1] that allows it to give meaningful notice, [DHS] is to give notice in compliance with ICWA.
An adjudication order was entered in March 2016 finding that GL was a dependent- neglected child. The trial court found Tara to be an unfit parent due to her mental-health issues that threatened both Tara's and GL's safety and due to her drug use during pregnancy. A case plan was developed to assist Tara in rehabilitating the situation so that she could properly parent GL in a safe, stable environment.
The matter was reviewed in July 2016. At that time, the trial court found that DHS had made reasonable efforts to assist Tara in her quest to have GL returned to her custody. Tara, however, was deemed noncompliant. She failed to obtain housing or employment. She did not complete parenting classes, nor did she submit to a psychological or drug-and-alcohol assessment. She tested positive for drugs, and she had been arrested more than once during this review period. Neither of the putative fathers had submitted to DNA testing, and both had been incarcerated during this review period. The case plan was continued with reiteration of the services to be provided and the requirements on Tara.
The matter was reviewed again in November 2016. At that time, Tara was deemed partially compliant with the case plan, having recently obtained housing, completed some parenting classes, attended some counseling, completed community service, and attended a psychological and drug-and-alcohol assessment.[2] She had failed, however, to obtain employment or transportation, to attend drug-and-alcohol treatment, or to pass random drug screens. The two men who Tara named as possible fathers for GL were excluded by DNA testing. The case plan and services were reiterated, specifying what Tara was expected to accomplish.
DHS filed a motion to terminate Tara's parental rights in February 2017, alleging the three aforementioned statutory grounds. In short, GL had been out of her mother's custody for over a year, and Tara had not remedied the causes for removal, there was little likelihood that further services would result in successful reunification, and Tara had manifested the incapacity or indifference to remedying the situation that prevented GL's return to her custody.
The termination hearing was conducted in April 2017. Tara recounted the ways in which she had complied with the case plan. She had acquired a job as a housekeeper at the local hospital, working mostly full time. She said that she had passed drug screens since June 2016,[3] had attended counseling, had obtained a leased home with her boyfriend and lived there since October 2016, had taken parenting classes, and had attended twelve Alcoholics Anonymous meetings. Tara stated that she had her last drink of alcohol in January 2016. Tara had applied for Social Security benefits, *454 and she had gone to the local adult education center on her own. Tara complained that DHS had failed to make a referral for her to get parenting-without-violence classes, failed to come to her home more than once for a home visit, and failed to promptly respond to her messages. Tara said that she was upset with DHS not informing her that her mother's home study in Pennsylvania had been approved, but it expired in November 2016.[4]
On cross-examination, Tara could not explain why she had missed four consecutive months of visits with GL in 2016, although she guessed it was probably because of her homelessness. Tara admitted that the gas had been disconnected for a few weeks in early 2017 due to failure to pay the full bill. Tara said that she was ready to have one-year-old GL in her custody and that she had a car seat (but no vehicle or driver's license), clothing, and a toddler bed.
Frank Gallant testified that he was Tara's live-in boyfriend. Frank admitted that he had just pleaded guilty to possession of drug paraphernalia, for which he was on three years of probation. Frank said that his driver's license was currently suspended for failure to pay traffic tickets. He testified that he, too, worked in housekeeping for the local hospital. Frank said that DHS had not given him or Tara any help with smoking cessation, although he would have no problem smoking outside for GL's benefit. He testified that he and Tara had applied for and received some local assistance with their rent and utilities, but they were fully responsible for their bills beginning in April 2017. He and Tara had six dogs, two living inside and four outside.
The DHS caseworker, Robbie McKay, testified that although Tara had somewhat complied with the case plan, it was not sufficient to demonstrate that she could safely parent GL. Robbie recommended termination of parental rights. Robbie recounted the problems that brought GL into care and said that it took a long time for Tara to be willing to go to a homeless shelter, preferring to live in a tent. Robbie referred Tara for housing assistance, leading to the apartment in which Tara lived. Robbie visited the home in March 2017, and Tara told her that she had just started her hospital job, so she currently had about one and a half months of employment. Tara had missed all five weeks of visitation with GL since the last hearing. In sum, Robbie did not believe that Tara had meaningfully complied with the case plan and services offered to her. She believed that Tara exhibited poor judgment, a lack of stability, and poor choices in men, all of whom she met in homeless camps and all of whom had criminal histories.
Robbie explained that although Tara had completed some classes and therapies, she did not exhibit an understanding of child development, getting frustrated with GL during visits, getting "mouthy," and refusing to take any direction. She said that Tara's house was "messy and cluttered" with some safety issues for GL, and she was concerned about Tara having six dogs. Tara got angry and stomped off *455 when Robbie was telling her what needed to be fixed in the home. Robbie stated that Tara was very hostile and paranoid in their interactions; she was worried about Tara's temper and unstable moods and about Tara leaving GL with her boyfriend while she worked at the hospital. In Robbie's opinion, Tara had not worked the case plan until "the case was halfway over."
Robbie testified that GL had been in the same foster placement the whole time and that GL was adoptable, being that she was so young and had no mental or physical impediments to adoption. The current foster placement expressed interest in adopting GL.
At the end of DHS's presentation of evidence, Tara's attorney asked that a "no reasonable efforts" finding be made against DHS and asked that the termination petition be denied. Tara's attorney contended that DHS wrongfully failed to work toward placement with family and failed to give Tara the services needed to address DHS's concerns. Those motions were denied.
Tara called her therapist, Joanie Henry, to the stand, who stated that Tara had completed twelve weeks of therapy and elected to stay in individual therapy, although she had missed her appointment in March. Her recommendation was for Tara to continue individual therapy.
Next, Patti Riley, who is a manager for the county's emergency solutions grant program, testified about helping Tara and Frank get into housing and out of their homeless situation. The program paid deposits for rent and utilities for their rental house, and then the program paid a percentage of those bills until they became able to take full responsibility for those costs. Patti said that as of April, Tara and Frank began paying rent on their own.
Cheryl Matlock testified that she helped Tara obtain her birth certificate and acquire identification, although it took about nine months to get it done. Cheryl explained that getting identification was crucial in Tara obtaining housing, Social Security, and the like.
The CASA[5] volunteer, Michelle Wewers, testified that she went to Tara's house and took pictures, and she briefly observed Tara during visitations. Michelle recommended that GL stay in her current placement. Michelle was present when Robbie tried to explain what needed to be fixed with the rental house, and she said that Tara became agitated, frustrated, and defensive, raising her voice and yelling at Robbie and then leaving the room. Michelle thought that the house was not appropriate for GL at that time and that it smelled like smoke.
At the conclusion of all the evidence, DHS's attorney and the child's attorney ad litem argued in favor of terminating Tara's parental rights. The ad litem suggested that, although GL should stay at the placement where she had been her whole life, the grandmother's home could be reevaluated after termination. Tara's attorney argued against termination, referring back to the grandmother's favorable home study that was allowed to expire and DHS's failure to provide certain classes to Tara.
The trial court ruled from the bench that it was in GL's best interest to terminate parental rights and that grounds had been proved. The trial court found that GL was adoptable and that she would be subject to physical and psychological harm if returned to Tara. The trial court remarked that Tara's demeanor in court was inappropriate, defensive, and paranoid, which the trial court "could see with my own eyes." The trial court's order recited that, *456 although Tara had completed some services "in the eleventh hour," she continued to exhibit mental-health issues with questionable decision-making and inappropriate behavior, in and out of court. The trial court also found that Tara had lacked stability for years, and her recent compliance did not show that she was now the stable and safe parent that GL needed. The order reflected the trial court's finding that DHS had proved by clear and convincing evidence the three statutory grounds: (1) the "failure to remedy" ground, (2) the "aggravated circumstances" ground, and (3) the "subsequent other factors or issues" ground. This appeal followed.
Tara first argues on appeal that the trial court committed reversible error by failing to require that DHS notify the Indian tribe as required by federal law. Tara acknowledges, however, that she raises this issue for the first time on appeal. Tara recognizes that we have previously held that a party's failure to raise this issue and obtain a ruling from the trial court precludes us from considering this issue on appeal. See Adams v. Ark. Dep't of Human Servs. , 2016 Ark. App. 131, 485 S.W.3d 275 ; Hall v. Ark. Dep't of Human Servs. , 2012 Ark. App. 245, 413 S.W.3d 542 ; Lauman v. Ark. Dep't of Human Servs. , 2010 Ark. App. 564, 2010 WL 3422459. Even so, Tara asks that we revisit this issue in light of other jurisdictions that do not require the issue to be raised in the trial court proceedings and instead allow it to be raised for the first time on appeal. We decline that invitation.
Moreover, the trial court did not err in not requiring notice to be given to the Indian tribe because the trial court had no reason to know that GL was an Indian child. Tara never provided any information whatsoever about GL's potential Indian heritage. Absent Tara providing that information to DHS, there was no basis on which to order DHS to provide notification of the proceedings and no reason for the trial court to believe that a relationship to any Indian tribe actually existed. This point on appeal holds no merit.
Tara's second point on appeal attacks the trial court's finding that the statutory grounds were proved by clear and convincing evidence. Tara focuses on the improvements she made in the five-month period between November 2016 (the permanency-planning hearing) and April 2017 (the termination hearing). Tara points out that she "may have been slow to comply" but completed many required assessments, attended therapy, acquired a job, established a rental home, stayed off drugs, and got her mental-health issues under control. DHS and the child's attorney ad litem counter that Tara's efforts were too little, too late, and furthermore, she was simply not able to safely parent GL. We are not left with a distinct and firm impression that the trial court made a mistake in terminating Tara's parental rights.
Although recent progress and efforts to comply in the months and weeks leading up to a termination hearing may and should be taken into consideration, it is not a bar to termination of parental rights. See Jessup v. Ark. Dep't of Human Servs. , 2011 Ark. App. 463, 385 S.W.3d 304. Our termination-of-parental-rights statute bears this out in Arkansas Code Annotated section 9-27-341(a)(4)(A) :
A parent's resumption of contact or overtures toward participating in the case plan or following the orders of the court following the permanency planning hearing and preceding the termination of parental rights hearing is an insufficient reason to not terminate parental rights.
*457 See also Moore v. Ark. Dep't of Human Servs. , 2015 Ark. App. 87, 2015 WL 585519 ; Gutierrez v. Ark. Dep't of Human Servs. , 2012 Ark. App. 575, 424 S.W.3d 329. The intent behind the termination-of-parental-rights statute is to provide permanency in a child's life when it is not possible to return the child to the family home because it is contrary to the child's health, safety, or welfare, and a return to the family home cannot be accomplished in a reasonable period of time as viewed from the child's perspective. Ark. Code Ann. § 9-27-341(a)(3). This need for permanency overrides a parent's request for additional time to improve circumstances, and courts will not enforce parental rights to the detriment of the well-being of the child. See Hollinger v. Ark. Dep't of Human Servs. , 2017 Ark. App. 458, 529 S.W.3d 242 ; Villaros v. Ark. Dep't of Human Servs. , 2016 Ark. App. 399, 500 S.W.3d 763 ; McElwee v. Ark. Dep't of Human Servs. , 2016 Ark. App. 214, 489 S.W.3d 704. A parent's past behavior is often a good indicator of future behavior. Villaros, supra. Also, this court is not to act as a "super factfinder," substituting its own judgment or second-guessing the credibility determinations of the court; we reverse only in those cases in which a definite mistake has occurred. Harris v. Ark. Dep't of Human Servs. , 2015 Ark. App. 508, 470 S.W.3d 316.
This DHS case had been open since shortly after GL's birth-almost a year and a half. We must give great deference to the trial court in evaluating the evidence and the witnesses in cases involving children. Here, the trial court determined that Tara continued to exhibit mental-health concerns and that she had failed to demonstrate the ability to safely parent her child. After our de novo review, we hold that the trial court did not clearly err in terminating Tara's parental rights. We therefore affirm.
Affirmed.
Virden and Murphy, JJ., agree.

No information about potential Indian Tribe relatives was ever provided by Tara to DHS. Tara never raised the ICWA matter again to the trial court in these proceedings.

The psychological evaluation conducted in August 2016 indicated that Tara met the criteria for mixed personality disorder. The examiner noted that she was anxious, was disorganized, lacked appreciation of what she needed to do to regain custody, was stubborn, made poor choices, had an unstable mood, was inclined to blame others for her difficulties, lacked ability to set appropriate boundaries, and lacked empathy, sensitivity, and trust.

Tara tested positive in May 2016 for amphetamine, methamphetamine, MDMA, benzodiazepines, and THC. In June 2016, Tara tested positive for methamphetamine and THC.

Comments on the record indicate that a hearing was conducted in March 2017 to address Tara's motion to find that DHS had not provided reasonable efforts in her case, specifically attacking DHS's failure to advise any party of the favorable home study on her mother's home in Pennsylvania, valid from May to November 2016. The grandmother expressed interest in helping to care for GL, but financial issues and lack of proper child care were barriers to the grandmother being a placement for GL. The caseworker stated that the home was not a placement option at that time. The caseworker denied that she actively tried to hide the report from anyone. Tara's motion seeking a new home study was denied.

"CASA" stands for Court Appointed Special Advocate for the child.