2011 Ark. App. 463

**Shawna JESSUP and Joel Jessup, Appellants**

v.

**ARKANSAS DEPARTMENT OF HUMAN SERVICES,**
Appellee.

**No. CA 11–87.**

Court of Appeals of Arkansas.

June 29, 2011.

Janet Renee' Lawrence, Conway, Thomas B. Wilson, Russellville, for appellants.

Tabitha Baertels McNulty, Little Rock, for appellee.

JOHN MAUZY PITTMAN, Judge.

This is an appeal from an order of the Craighead County Circuit Court terminating the parental rights of appellants Shawna Jessup and Joel Jessup to their son P.J., born April 12, 2004, and to their daughter, S.J., born April 3, 2003. Shawna's attorney has filed a motion to withdraw as counsel on appeal asserting that there are no non-frivolous issues that could arguably support her appeal. Joel's attorney has filed a brief arguing that the trial court erred in terminating his parental rights. We affirm the order terminating appellants' parental rights and grant Shawna's attorney's motion to withdraw.

On May 21, 2009, an Arkansas Department of Human Services (DHS) family service worker signed the following affidavit:

b. Agency received a report of Environmental Neglect and Inadequate Supervision on 2–25–09. It was alleged that the home was filthy and nasty/trash was everywhere and they had mice and roaches. Reporter was not sure if there were drugs in the home but there were also cat feces in the home. Shawna was also supposed to hitchhike from Memphis to Blytheville with a trucker. A friend who had seen Shawna said she was scared but they thought that it could have been because of her husband who had been in a mental facility after he alleged to have had a blackout. It was believed that Shawna is addicted to prescription drugs. The mom was supposed to have cut almost all of her hair off last week and the kids may spend a lot of time in their rooms. We later received information that the mom was at home and P.J. got out of the house and was seen riding his bike blocks away. Luckily a DCFS Worker (Brenda Morton) spotted him and he was able to show her where he lived. The mom was seen by Morton and the mom later claimed the doctor had prescribed her some new medication and it made her drowsy. This report was founded for Inadequate Supervision. We also received allegation that the mom/dad were

not home one occasion when the Learning Center's School Bus arrived at the home to drop him off. Mom claimed she was at a drop off site at Bill and Jerry's Grocery Market in order to get S.J. (they attend different schools) and the dad was responsible for being at home in order to get the boy (P.J.) But the dad was not there. The bus driver then dropped the child off at the emergency contact address after phone calls were unsuccessful.

c. CHRIS Search past true finding on Joel Jessup in 1994 for abuse on at that time a girlfriend's son. No prior reports in CHRIS on the mom under her name and birth date. However, during the course of the investigation many concerns arouse: (1) The mom and dad had broken up and they lost their home (HUD) and the mom and kids had to venture/staying with friends and relatives due to them not having a place to live. (2) Domestic Abuse was previliant [sic] and the dad had ever [sic] stolen the mom/kids medicine along with clothes and burned it up. (3) The father was also battling mental injury and he may have not been taking his medicine or getting adequate follow-up care. (4) He and the mom were alleged to have been addicted to prescribed and illegal drugs (5) The mom came to the office and took a drug test and she only passed 2 of the six drugs tested. She had admitted to using THC recently but she claimed she had some prescription drugs that caused positive test (scripts for Hydrocodine/Clonopline/Daxirdephansen/Syntec. She tested positive for Meth. and claimed an allergy medicine may have caused the positive reading but at this time, we have no evidence of this.) (6) The mom also seemed to be overly nervous/cried a lot during the office visit. (7) Mom may have not been as forthcoming with assuring the agency of various places she had lived with the kids after the breakup of her and her husband. (8) The mom claimed that the father had came around and picked up P.J. and dropped him on his bottom. (9) Kids did not seem to have any recent instability/place to live of their own and it seemed that the mom was dragging them from place to place. Due to a constellation of issues, it was determined that children needed to be placed in care of this was best decision because their health and safety were at risk. (10) Mom diligence of obtaining medical treatment for S.R. was in question whereas she was believed to have "pink eye." 72 Hour hold was placed on P.J. and S.J. at 4:40 p.m.

Based on the petition filed by DHS on May 26, 2009, the circuit court entered an order for emergency custody.

The court held a probable-cause hearing on May 29, 2009, at which Shawna's attorney was present. The court found probable cause and directed DHS to develop an appropriate case plan. It ordered the parents to cooperate with the department; to comply with the case plan and court orders; to view "The Clock is Ticking" video; to remain drug-free and submit to random drug screens; to keep the department informed of a current address; to submit to a drug and alcohol assessment, and follow the recommendations thereof, in the event of a positive drug screen; to submit to a psychological evaluation and follow the recommendations; to complete parenting classes; to obtain and maintain clean, safe, and stable housing, with utilities; to obtain and maintain stable employment or provide sufficient income to support the family; and to attend Narcotics Anonymous and Alcoholics Anonymous meetings and anger-management classes.

Appellants attended the adjudication hearing held on September 1, 2009. The

court found the children to be dependent-neglected; that the family did not have stable housing; and that Shawna tested positive for THC and methamphetamine. The court set the goal of reunification and approved the case plan developed by DHS. It gave appellants visitation at the discretion of the department and the attorney ad litem. It again placed the same requirements as before on appellants; directed Joel to be "medication compliant"; and ordered appellants to give DHS their addresses and telephone numbers and any prescriptions that they were prescribed.

Dr. George DeRoeck administered a psychological evaluation to Shawna on December 22, 2009. In his report, Dr. DeRoeck stated that Shawna was separated from her husband, with whom she had split up before, and whom she described as erratic, angry, physically abusive, and an abuser of medications/drugs/alcohol. He noted that she was currently residing in a trailer with her boyfriend, making $75.00 per week babysitting, and experiencing financial difficulties. Dr. DeRoeck noted that Shawna had taken medication off and on since she had received mental health counseling at seventeen and was currently on Paxil, Klonopin, and Soma. He said that Shawna's drugs of choice were alcohol and cannabis, which she began using at fourteen; she started using methamphetamine at twenty-five. She admitted that she and her husband had been "methed out" and that she had drunk a lot of beer since the children had been placed in foster care. Dr. DeRoeck stated:

> Based on the current evaluation, Ms. Jessup is functioning within a low average range of intellectual development and her overall achievement is commensurate with this level of functioning. No clear indication of organicity appeared evident based on the testing.

From a personality point of view, indications of dependent personality characteristics are noted. She has a tendency to feel easily overwhelmed and may give in to her children's demands. Though viewing herself a competent parent, the PSI suggested a tendency to be stressed in parenting. A tendency to defer parenting to others (extended family/boyfriend, etc.) may be indicated.

In this examiner's opinion, a lack of appreciation of the environmental limitations of the home is noted. She described, in glowing terms, a positive relationship with her new boyfriend despite him being a recovering alcoholic/addict and being unemployed.

Deficits in judgment appeared evident. She identified regretting her three months of daily alcohol abuse. She described being in recent recovery and is ostensibly attending AA. She has had inconsistent response to medications and discontinues medications when drinking. She does present with evidence of anxiety disorder—describing social anxiety and panic.

In my opinion, her overall prognosis for effectively maintaining in the care of her children is guarded, at best. Consideration for alternate placement may be indicated based on the extent of her substance abuse, paucity of judgment and emotional difficulty. However, consideration for reunification may be indicated if she is able to maintain viable recovery for an extended amount of time and if she receives effective treatment regarding anxiety-based symptomology.

Dr. DeRoeck diagnosed Shawna with anxiety disorder, NOS, generalized anxiety/social phobic; rule out polysubstance induced persisting anxiety disorder; dysthymic disorder—early onset; polysubstance dependence—in early controlled environmental remission (cannabis, alcohol

and methamphetamine) (AXIS I); and personality disorder, NOS, dependent trait—rule out disorder (AXIS II). He made the following recommendations:

Consideration for alternate placement of children given significant history of polysubstance dependence, unresolved anxiety disorder and deficits in judgment of longstanding duration.

If interested in working toward reunification, the following are indicated:

1. Long-term residential treatment regarding polysubstance dependence. Consideration for chemical-free living is also indicated. In addition, she will require a sponsor and continue urine screens as well as an evaluation for potential for alcohol abuse (potential to switch addictions is highly indicated). This level of intervention is indicated given her checkered pattern of compliance. Of significance was her missing item on the PAI regarding plan for suicide.

2. Evaluation of psychoactive medication given the potential for use with alcohol/other drugs. An evaluation of other medications for social phobia (Zoloft, etc.) as well as the possibility of other non-addictive medications for treatment of panic may be indicated.

3. Stress management counseling. Efforts to learn other non-medication methods of coping with stress are indicated, i.e., learning to set priorities, time management skills, assertiveness skills, etc.

4. Personalized counseling to resolve issues in potential for continued substance abuse, i.e., unresolved grief over loss of first husband and father, working through dependent personality characteristics and description of ambivalence in current marriage.

Dr. DeRoeck also administered a psychological evaluation to Joel on December 22, 2009. In his report, he related Joel's background information as follows:

He attended school to tenth grade in the regular classroom. He was diagnosed with attention deficit hyperactivity disorder. He obtained a GED while incarcerated. He was retained in first grade.

Mr. Jessup has been married to Shawna for two years and they have two children—ages 6 and 5. They are separated. He reported believing his daughter, age 6, has bipolar symptomology.

Occupationally, he is unemployed. He is residing with friends and his mother drove him to today's session.

Medically, he reported being hit by a car in 07/2000 and was in a coma for a significant amount of time. He was intoxicated at the time and reported having bipolar symptomology and was self-medicating via alcohol use. (Mr. Jessup is known to this examiner, as I evaluated him for Social Security disability benefits in the past.)

Mr. Jessup was inpatient at St. Bernard's Behavioral Health on two occasions. He identified, "I had a lot of trouble because of her cheating and I had to fight him." He was at the Mid-South Crisis Center on one occasion. He has had minimal followup. He is prescribed Lithium and Neurontin (medications for bipolar disorder) and Vistaril (antianxiety) by his family physician. He is prescribed Hydrocodone though cannot afford it at this time.

Legally, he reported "at least 20" public intoxication charges. He was also arrested for burglary/theft and was in prison for 16 months.

*SUBSTANCE ABUSE:*

Mr. Jessup identified a notable history of methamphetamine use and this is his

drug of choice. He reported a number of relapses—the last one month ago. He had a history of IV use. His last use of alcohol to the point of intoxication was two weeks ago. He also reported using hallucinogens and heroin. He uses cannabis when he runs out of Vistaril and last used it one week ago.

Dr. DeRoeck noted that Joel was "odorous," with poor hygiene, unkempt hair, and torn pants. He stated that Joel presented as "clearly emotionally unstable" and that he had readily admitted to continuing substance abuse in an attempt to manage anxiety. As to Joel's mental status, Dr. DeRoeck stated:

Suicidal ideation is denied and he identified three previous suicide attempts (via overdose). He identified a tendency to be easily angered and stressed. He justified his variability of mood associated with the fact that he is nervous frequently. He did not appear intoxicated today.

Auditory and visual hallucinations are identified during periods of intoxication though not currently. He was not responding to internalized cues. Difficulty with sustained attention to detail was evident.

His reasoning was difficult to follow and a loosening of associations was evident as a result. He identified significant changes in mood and difficulty with impulse control following his coma in 2000. Prior, he reported bipolar symptomology though, "A lot of times I was just depressed." He alluded to periods of lost time though denied specific phobias or irrational fears.

Dr. DeRoeck said that Joel did not appear to be stable enough to care for his children at that time and that he should be considered for inpatient hospitalization. He diagnosed Joel with personality changes due to general medical condition—combined type (head injury/polysubstance dependency); polysubstance dependence—alcohol, amphetamine, cannabis; dementia-mild secondary to head injury; and "mood disorder, NOS versus bipolar disorder, NOS." He made the following recommendations:

1. Given admission of polysubstance use and potential for suicide, consideration for inpatient hospitalization (dual diagnosis) may be indicated, He is very prone to relapses despite indications of taking some psychoactive medications. His tendency to be erratic and to make decisions based on emotion rather than reason suggests a poor prognosis without more intensive treatment. His lack of support (living with different friends) as well as description of uncontrolled tension/anxiety suggests a potential for self-harm.

2. Consideration for chemical-free living following more intensive treatment of his current psychiatric condition is highly indicated. · His inability to maintain viable recovery is suggestive of this type of living situation.

3. Alternate placement of his children. Following a period of recovery and stabilization on medication, consideration for supervised visitation only appears indicated.

4. Monitoring of his medication is necessary due to his tendency to overuse medication (particularly Vistaril).

Dr. DeRoeck's reports were entered into evidence at a review hearing held on January 26, 2010. Shawna attended this hearing but Joel did not, because he was in a rehabilitation facility run by a religious organization. The court entered an order continuing the goal of reunification and finding that DHS had made reasonable efforts to provide reunification services. It noted that Shawna had watched "The Clock is Ticking" video; taken parenting

classes and a psychological evaluation; and visited her children. It stated that she had not complied with the case plan in that she had tested positive on the drug screens; had refused to let the worker see her prescriptions; had not provided proof of attendance at NA/AA meetings; had not completed domestic-violence education; and had not visited regularly with her children.

The court found that Joel had complied with the case plan by taking the psychological evaluation but had not complied in that he had tested positive for drugs and had not visited his children regularly. The court continued supervised visitation. In addition to the previously-ordered actions, it ordered Shawna to enter a long-term residential treatment program for a minimum of ninety days; to give the department the children's social security cards; to submit the children's social security payments to the department; to remain medication compliant; and to provide the bottles of the prescriptions she was taking to the department. It directed DHS to determine if Joel's Messiah Ministry Rehabilitation Facility was appropriately licensed; if not, the court directed him to enter a long-term residential treatment program for a minimum of ninety days.

The court held a permanency-planning hearing on April 27, 2010, which Shawna attended. Joel was still in rehabilitation at the non-accredited Messiah Ministry. The court continued the goal of reunification and directed that a fifteen-month review hearing be held because DHS had not provided anger-management and domestic-violence classes. The court noted that Shawna had visited regularly with her children; submitted their social security payments to the department; and provided a prescription for clozapine to the department. It stated that she had not complied by testing positive for drugs on January 21, 2010; January 28, 2010; March 4, 2010; April 2, 2010; April 22, 2010; and April 23, 2010; not providing proof of attendance at NA/AA meetings; not completing domestic-violence or anger-management classes; not providing the children's social security cards to the department; not completing a ninety-day residential facility stay; not complying with psychological recommendations; and not finding suitable employment. The court noted that Joel had complied with the case plan by taking a psychological evaluation but that he had not complied with the plan by testing positive for drugs; completing a ninety-day residential treatment program; and not complying with psychological recommendations. The court also entered an order that Shawna's live-in boyfriend would have no contact with the children.

The court held a fifteen-month permanency-planning hearing on July 29, 2010. DHS filed a copy of the Arkansas criminal history report of Shawna's live-in boyfriend, which revealed fourteen convictions for breaking or entering; burglary; theft; drug delivery, possession, manufacturing, and paraphernalia; and battery between 1991 and 2000. In the resulting order, the court changed the goal of the case to termination and adoption. It noted that Shawna had made no further progress with the case plan; that she had tested positive for drugs on July 29, 2010; and that she had not maintained contact with the department since April 28, 2010, when she left the OMART treatment facility. The court also noted that Joel had not made any further progress.

DHS filed a petition for termination of appellants' parental rights on several grounds. The court held the termination hearing on September 28 and October 28, 2010. Both appellants attended with their attorneys and tested negative for drugs. Testimony was given by Amanda

Thompson, a family-service worker, and Terry Blanchard, a supervisor with the Craighead County Division of Children and Family Services. Dr. DeRoeck testified by telephone. Joel testified but Shawna did not.

On November 19, 2010, the circuit court entered an order terminating appellants' parental rights on the grounds that they had failed to rehabilitate themselves and correct the conditions that caused removal while the children had continued out of their custody for twelve months, despite a meaningful effort by DHS to rehabilitate them. It found that the parents had failed to comply with the case plan and the court orders by not having stable housing. The court also found that Shawna had not resolved her controlled-substances issues; had not provided proof of attending NA/AA meetings; had not completed a court-ordered inpatient rehabilitation program; and had not completed an anger-management course.

The court also found that, subsequent to the filing of the original petition, other factors or issues had arisen demonstrating that return of the children to appellants' custody was contrary to the children's health, safety, or welfare, and that, despite the offer of appropriate family services, appellants had manifested the incapacity or indifference to remedy the subsequent issues or factors.[1] The court made the following findings:

The Court finds that the parents have failed to comply with the case plan and the orders of the Court in that the father's recent compliance with the case plan and court are troubling in that the father does not have adequate resources to care for the children based upon his testimony of earnings versus expenses. Due to the father recently acquiring a home, the Court has concerns whether the father can demonstrate the ability to maintain a household on his present earnings. The Court finds that there is a lack of time to see if the father can maintain his sobriety. The Court makes a finding that Dr. DeRoeck's testimony is credible, in that the psychological evaluation indicates that Mr. Jessup is prone to relapse and recommended alternate placement of his children. The Court is concerned by the testimony of Dr. DeRoeck as to the father's mental

---

1. Arkansas Code Annotated section 9–27–341(b) (Repl.2009) provides in relevant part:
     (3) An order forever terminating parental rights shall be based upon a finding by clear and convincing evidence:
       (A) That it is in the best interest of the juvenile, including consideration of the following factors:
       (i) The likelihood that the juvenile will be adopted if the termination petition is granted; and
       (ii) The potential harm, specifically addressing the effect on the health and safety of the child, caused by returning the child to the custody of the parent, parents, or putative parent or parents; and
       (B) Of one (1) or more of the following grounds:
       (i)(a) That a juvenile has been adjudicated by the court to be dependent-neglected and has continued out of the custody of

the parent for twelve (12) months and, despite a meaningful effort by the department to rehabilitate the parent and correct the conditions that caused removal, those conditions have not been remedied by the parent.

. . . .

(vii)(a) That other factors or issues arose subsequent to the filing of the original petition for dependency-neglect that demonstrate that return of the juvenile to the custody of the parent is contrary to the juvenile's health, safety, or welfare and that, despite the offer of appropriate family services, the parent has manifested the incapacity or indifference to remedy the subsequent issues or factors or rehabilitate the parent's circumstances that prevent return of the juvenile to the custody of the parent.

health and that the father's history requires additional time to ensure his stability which makes the father's recent compliance more problematic. The Court finds the father, has been through several rehabilitation programs without continued ₁₃success. The Court finds the mother has been non-compliant with the Court orders and the case plan. The mother has not completed anger management classes, the mother has not completed domestic violence classes. The Court finds that the mother has exhibited poor judgment in who the mother has chosen as a boyfriend who has an extensive criminal history. The mother, is non-compliant in that she has not provided proof of attending NA/AA meetings, the mother has not completed a court ordered in-patient rehabilitation program.

The court found, by clear and convincing evidence, that it was in the best interest of the children to terminate appellants' parental rights, and stated that it had specifically considered the likelihood that the children would be adopted and the potential harm to their health and safety of returning them to appellants' custody. The court found that the foster parents wanted to adopt both children and added:

> The Court finds that the mother does not have appropriate or suitable housing for the children to return home to her. The Court finds the mother has unresolved drug issues. The Court finds the mother lacks financial resources to provide for housing and the other basic needs of the children. The Court finds the mother's boyfriend has a criminal background that would pose a safety concern for the children.... The Court finds the father has made progress but progress has been very recent. The Court finds that stable housing was an issue for the family at the time of removal, and currently the father has pro-

vided insufficient income to meet the needs of the children to provide stable housing. The father gave testimony that he receives only six hundred dollars a month in social security and that his rent costs five hundred and seventy five dollars.

> The court finds the father has only recently completed what has been asked of him. The father completed parenting classes on September 13, 2010; the father completed his twelve step program on September 11, 2010; the father completed his non Arkansas accredited residential program on September 26, 2010 two days before the termination of parental rights hearing began. The Court finds the testimony of the Dr. George DeRoeck to be credible.

Appellants filed timely notices of appeal.

■■■ ₁₄We review cases involving the termination of parental rights de novo. *Welch v. Arkansas Department of Human Services,* 2010 Ark. App. 798, 378 S.W.3d 290. The grounds for termination must be proven by clear and convincing evidence. *Id.* When the burden of proving a disputed fact is by clear and convincing evidence, the question on appeal is whether the circuit court's finding that the disputed fact was proven by clear and convincing evidence is clearly erroneous, giving due regard to the opportunity of the circuit court to judge the credibility of the witnesses. *Id.* The termination of parental rights is a two-step process that requires the circuit court to find that the parent is unfit and that termination is in the best interest of the child. *Id.* The first step requires proof of one or more of the statutory grounds for termination. Ark.Code Ann. § 9–27–341(b)(3)(B). The second step requires consideration of whether the termination of parental rights is in the children's best interest. Ark.Code Ann. § 9–27–

341(b)(3)(A). This includes consideration of the likelihood that the juvenile will be adopted and the potential harm caused by returning custody of the child to the parent. The court, however, does not have to determine that every factor considered be established by clear and convincing evidence. *Welch, supra.* Instead, after considering all of the factors, the evidence must be clear and convincing that termination is in the best interest of the child. *Id.* Additionally, the circuit court is not required to affirmatively identify a potential harm or to find that actual harm would result if the child were returned to the parent. *Davis v. Arkansas Department of Health & Human Services,* 98 Ark.App. 275, 254 S.W.3d 762 (2007).

We first address the motion to withdraw. Pursuant to *Linker–Flores v. Arkansas Department of Human Services,* 359 Ark. 131, 194 S.W.3d 739 (2004), and Rule 6–9(i) of the Rules of the Arkansas Supreme Court and Court of Appeals, Shawna's attorney has filed a no-merit brief asserting that there are no issues of arguable merit for appeal and a motion requesting to be relieved as counsel. The clerk's packet to Shawna was returned as unclaimed.

■ Shawna moved for a directed verdict, asserting that there was insufficient evidence that the children were likely to be adopted; that there was potential harm to them if they were returned to her; that she had not remedied her drug use; that "other factors" had arisen; that she had abandoned her children; and that she had failed to support them. The court granted this motion as to the support and abandonment issues but ruled against her on all other bases. We agree with Shawna's attorney that it would be frivolous to argue that DHS failed to prove its case. At the time of the termination hearing, the children had been out of Shawna's care for over twelve months, and she had failed to remedy the conditions that had caused them to be removed from her custody. As "another factor," she moved in with a man with a lengthy criminal history after the case began. With regard to the best-interest analysis, the case worker testified that the foster family was interested in adopting the children together. Shawna did not follow Dr. DeRoeck's recommendations and utterly failed to remedy her drug problems, having tested positive for every drug screen until the permanency-planning hearing held in April 2010. She failed to complete a drug treatment program. At the time of the termination hearing, she was still living with her boyfriend with a criminal history, who was the subject of a no-contact order, even though she was fully aware that her living with him would likely prevent reunification with her children. She was unemployed, other than cleaning motel rooms for $3 a room. We find that Shawna's attorney has complied with the requirements for no-merit briefs and that Shawna's appeal is wholly without merit. Consequently, we grant the motion to withdraw and affirm the termination of Shawna's parental rights.

■ We now address Joel's argument that the trial court erred in finding that termination of his parental rights was in the children's best interest. At the end of the termination hearing, the circuit court issued a lengthy ruling from the bench, noting Joel's recent efforts:

> [T]he Court finds that his mental health concerns as raised by Dr. De-Roeck are certainly a factor, and in fact, Dr. DeRoeck was concerned. I've seen many psychological evaluations by Dr. DeRoeck, and Dr. DeRoeck actually recommended alternative placement of Mr. Jessup's children. And even following a period of recovery and stabilization on medication, there was consideration for

supervised visitation only based upon that evaluation. The Court does want to note that Mr. Jessup has made progress in this case, and, at this point, I'll go ahead and say that if we were at the point of the Permanency Planning Hearing where I had to consider whether the father had made significant measurable progress toward reunification and whether he had made diligent efforts toward reunification my opinion in that particular hearing would likely be that Mr. Jessup compliance would earn him an additional three months to work toward reunification. But, at this point, where we are in the case we've already been through and I think the Court did allow some additional time, and quite frankly that additional time was granted based upon concerns the Court had about the Department failure to offer certain services. But, at this point as we stand here today, even though that progress has been made and the compliance has been made the Termination Statute specifically addresses what happens with compliance on the eve of termination. . . . Let me restate that 9–27–341 subparagraph (a)(4)(A) the statute says a parent resumption of contact or overtures toward participating in the Case Plan or following the Orders of the Court following the Permanency Planning Hearing and preceding the Termination of Parental Rights Hearing is an insufficient reason to not terminate parental rights. The Court notes that stable housing was an issue for the family at the time of removal . . . and stable housing is still an issue. I know that since the first day of the Termination Hearing the father had obtained housing, but I can't imagine anything much more on the eve of termination than finding housing and the first day of the hearing and the conclusion of the hearing today. And even though that is commendable, that's not enough time to demonstrate stability given the history especially. There is also concern . . . about health and safety, the father has testified he receives $600 and something in his words in Social Security Benefits per months, and he has testified he has $575 dollars in monthly expenses for housing alone. The Court . . . believes that is insufficient income to meet the needs of these children especially given the fact that one of these is a special needs child. The Court finds that proof was submitted that Mr. Jessup had completed parenting only on . . . September 13 of 2010. Mr. Jessup submitted proof that he completed the 12–step program on September 11, 2010, and he completed a lengthy, and again that is commendable, but a lengthy problem [sic] but only two days before the Termination Hearing began. And those things contribute to the Court's concern about the health and safety of the children if returned to either parent.

Citing *Prows v. Arkansas Department of Health & Human Services*, 102 Ark. App. 205, 283 S.W.3d 637 (2008), Joel argues that the circuit court committed error in misstating the termination statute regarding last-minute efforts; in not giving adequate weight to the progress that he had recently made; and in failing to give him another three months to "prove his worthiness." We do not agree. In *Prows*, the circuit court expressly refused to even consider the mother's recent improvement because it construed the termination statute as preventing it from doing so. This court reversed, stating that, although last-minute improvements will not outweigh a petition for termination, the circuit court must consider and weigh that evidence. In the case at bar, the circuit court's understanding of the statute's requirements was demonstrably correct because it clear-

ly did consider and weigh the evidence of Joel's recent improvements in arriving at its decision.

The circuit court considered the evidence of Joel's release from an unaccredited drug program and his completion of parenting classes shortly before the first day of the termination hearing, as well as his attainment of housing between the first and second days of the trial, in the context of all of the evidence presented at trial. That evidence demonstrated that the unaccredited treatment program Joel attended, while helpful with his drug problems, did not offer any services to address his profound and longstanding mental problems, about which Dr. DeRoeck wrote at length. At the time of the termination hearing, Joel had not demonstrated his ability to remain sober in an unstructured environment for a significant time period. This was especially important in light of his admission that he had battled drug addiction and had attended at least ten periods of rehabilitation since he was a teenager. Without any other resources, his disability benefits were inadequate to provide a home and all other necessities for his children. Although Joel did make commendable progress in attaining sobriety, he did not, unfortunately, demonstrate similar progress in achieving sufficient mental health and stability to be a parent to his children. On this record, we cannot say that the trial court clearly erred in finding that termination of Joel's parental rights was in the children's best interest.

Affirmed; Shawna Jessup's counsel's motion to withdraw granted.

GLADWIN and BROWN, JJ., agree.