SLIP OPINION

Cite as 2014 Ark. App. 715

# ARKANSAS COURT OF APPEALS

DIVISION III
No. CV-14-661

| | | |
|---|---|---|
| ANITA HARBIN | | **Opinion Delivered** December 17, 2014 |
| | APPELLANT | |
| V. | | APPEAL FROM THE CLEBURNE COUNTY CIRCUIT COURT [NO. JV 2012-123] |
| ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILD | | HONORABLE LEE WISDOM HARROD, JUDGE |
| | APPELLEES | AFFIRMED |

## RITA W. GRUBER, Judge

Anita Harbin appeals the circuit court's May 8, 2014 order that terminated her parental rights to B.T., who was born on November 2, 2011.[1]  Harbin challenges the circuit court's finding that statutory grounds of unfitness existed for termination.  She also contends that there was not sufficient evidence to support the court's finding that B.T. would be subject to potential harm if returned to appellant's care.  We affirm.

Our review of termination-of-parental-rights cases is de novo.  *Dinkins v. Ark. Dep't of Human Servs.*, 344 Ark. 207, 40 S.W.3d 286 (2001).  Grounds for termination must be proven by clear and convincing evidence, which is such a degree of proof that will produce in the fact-finder a firm conviction as to the allegation sought to be established.  *Hughes v.*

---

[1]The order also terminated the parental rights of the legal father, who consented to the termination, and the putative father, who did not attend the termination hearing. Neither man is a party to this appeal.

*Ark. Dep't of Human Servs.*, 2010 Ark. App. 526. Our inquiry is whether the trial court's finding that the disputed fact was proven by clear and convincing evidence is clearly erroneous. *Id.* Credibility determinations are left to the fact-finder. *Schaible v. Ark. Dep't of Human Servs.*, 2014 Ark. App. 541, 444 S.W.3d 366.

The intent of our termination statute is to provide permanency in a minor child's life in circumstances where returning the child to the family home is contrary to the child's health, safety, or welfare, and where the evidence demonstrates that the return cannot be accomplished in a reasonable period of time as viewed from the child's perspective. Ark. Code Ann. § 9-27-341(a)(3) (Supp. 2013). The child's need for permanency and stability may override the parent's request for additional time to improve the parent's circumstances. *Schaible*, 2014 Ark. App. 541, at 8, 444 S.W.3d at 371. The issue is whether the parent has become a stable, safe parent able to care for the child. *Id.* The court may consider the parent's past behavior as an indicator of future behavior, and even full compliance with the case plan is not determinative. *Id.*

Termination of parental rights is a two-step process requiring a determination that the parent is unfit and that termination is in the best interest of the child. *Jessup v. Ark. Dep't of Human Servs.*, 2011 Ark. App. 463. The first step requires proof of one or more statutory grounds for termination; the second step, the best-interest analysis, includes consideration of the likelihood that the juvenile will be adopted and of the "potential harm . . . caused by returning custody of the child to the parent[.]" Ark. Code Ann. § 9-27-341(b)(3)(B), (b)(3)(A) (Supp. 2013); *Schaible*, 2014 Ark. App. 541. In determining potential harm, which

SLIP OPINION

is forward-looking, the court may consider past behavior as a predictor of likely potential harm should the child be returned to the parent's care and custody. *Dowdy v. Ark. Dep't of Human Servs.*, 2009 Ark. App. 180, 314 S.W.3d 722. There is no requirement to establish every factor by clear and convincing evidence; after consideration of all factors, the evidence must be clear and convincing that termination is in the best interest of the child. *Jessup*, 2011 Ark. App. 463.

In the present case, the Arkansas Department of Human Services (ADHS) filed its petition for emergency custody and dependency-neglect of B.T. on September 6, 2012. Attached to the petition was an affidavit by family-services worker Susan Morrow about visiting appellant's home on September 4, 2012, to investigate a report to the child-abuse hotline. According to the caller, an ambulance had been called because appellant "was out of her mind" and B.T. had been sent away with a family member. That day, when someone tried to wake appellant over concern about the length of time B.T. was sleeping, appellant began spinning in circles and calling out "Momma, Momma." A call to 911 was made, and the ambulance took appellant to the hospital for a possible overdose or reaction to something she had ingested. Morrow subsequently met with appellant, who said that her aunt took B.T. from the home and that B.T. was with appellant's cousin Carissa, whose last name appellant did not know. When Carissa returned B.T. to the home, Morrow saw appellant pick up B.T., walk a few steps, make a telephone call, and—with no apparent regard for the child in her arms—begin yelling into the phone and bending over. Appellant said that she did not use drugs, but she tested positive for methamphetamine and benzodiazepine. ADHS then took

3

SLIP OPINION

a seventy-two-hour hold on B.T., and she was placed in ADHS's legal custody by an ex parte order for emergency custody.

On September 26, 2012, the circuit court adjudicated B.T. dependent-neglected due to appellant's drug use and irrational behavior while supervising B.T. The court found that it was contrary to B.T.'s welfare to be returned to appellant's custody. The goal of the case was established as reunification. Appellant was ordered to cooperate with ADHS, follow the case plan, refrain from using or possessing controlled substances, submit to random drug screens, and obtain a drug-alcohol assessment and follow its recommendations.

At the February 20, 2013 review hearing, the circuit court again found that returning B.T. to appellant was contrary to B.T.'s welfare. The court found that appellant had partially complied with the case plan and court orders; specifically, she had failed to provide proof of drug therapy. The court stated that appellant needed "to work on stable housing, counseling, and providing documentation of completion of services." She was again ordered to cooperate with ADHS, follow the case plan, refrain from using or possessing controlled substances, submit to random drug screens, and obtain a drug-alcohol assessment and follow its recommendations.

On August 14, 2013, the day of the permanency-planning hearing, ADHS filed its petition to terminate parental rights. In the August 26, 2013 permanency-planning order, the circuit court found that appellant had been minimally compliant with the case plan:

> *She has* recently obtained housing, but has since *entered in-patient treatment and will now have to establish a safe, stable home prior to reunification*, and now receives disability income. She has also completed parenting classes. The mother passed random drug screens on 4/4/13, 4/17/13, and 7/3/13. *The mother has not attended drug counseling or*

4

*mental health counseling, which were designated to address the issues that caused removal. The mother failed a random drug screen on 6/6/13 for methamphetamine and THC.*

(Emphasis added.) The court found that B.T.'s biological father, John Timberlake, was completely noncompliant: he had no stable housing or income, failed to attend counseling, had an open ADHS case concerning his other children, and had a true finding for sexual abuse. The court found it contrary to B.T.'s welfare to be returned to the custody of a parent, and the goal of the case was changed to adoption.

ADHS alleged in its termination petition that terminating appellant's parental rights was in B.T.'s best interest and that appellant was unfit under statutory grounds including these:

> That B.T. had been out of her custody for at least twelve months, and despite meaningful effort by ADHS to remedy the issues causing removal, those issues had not been remedied. Ark. Code Ann. § 9–27–341(b)(3)(B)(i)(*a*).

> That, subsequent to the filing of the original dependency–neglect petition, other factors arose demonstrating that returning B.T. to appellant's custody "is contrary to [B.T.'s] health, safety or welfare and that despite the offer of appropriate family services, the parent has manifested the incapacity or indifference to remedy the subsequent issues or factors or rehabilitate the parent's circumstances which prevent return of [B.T.] to the custody of the parent." Ark. Code Ann. § 9–27–341(b)(3)(B)(vii)(*a*).

The termination hearing took place on October 28, 2013 (five days before B.T.'s second birthday), and December 4, 2013. Miranda Monroe, appellant's caseworker throughout the case, explained on October 28 why she was recommending termination even though appellant was "substantially compliant" with the case plan: appellant was noncompliant at the August 2013 hearing, only recently returned for mental–health counseling, and finished drug-treatment counseling only twenty days before the termination

hearing. Appellant's mental-health and drug-treatment services were through the Wilbur D. Mills program, and she was currently an inpatient in the Kay Goss program—a part of Wilbur D. Mills—where services included drug counseling, support groups, and random drug screens, and where residents could be kicked out for using drugs or breaking rules. Monroe testified that appellant tested positive for meth and THC in June 2013, that later drug screens were negative, but that there was a period of time when ADHS could not find her for the screens. Monroe recommended termination because appellant had shown no stability in a drug-free life, a stable home, or parenting:

> [I]*t's all very late. And as far as stable housing, she has not done that. As far as her remaining drug free, there's not been a very long period of time.* It's only been since she has [gone] into Wilbur D. Mills. I mean, she has not been staying drug free since shortly after this case opened. *It's just been since . . . we stated that we want to change the goal to adoption that she has decided to become compliant.*

(Emphasis added.)

In December 2013, appellant testified that she used methamphetamine in June 2013 and lived with Timberlake and different friends, tried to find residence at shelters, and slept in an abandoned home before she began drug treatment. She testified that she relapsed and used drugs after she walked into a house where two people had been shot and meth was being cooked; one victim, Timberlake's six-month-pregnant cousin, had been shot in the head and killed. Appellant testified that Paul Hicks, her current boyfriend of a month-and-a-half, was a convicted felon with alcohol problems; they had met at church; he was an outpatient at Wilbur D. Mills; they regularly attended AA/NA meetings; and they had been told that relationships with other former addicts could lead to relapse. Monroe testified that appellant

6

had continued to live with Timberlake until June 2013 despite being told around February 2013 that he had a "true finding"of sexual activity with a minor. The circuit court took the case under advisement.

On February 19, 2014, the court announced its findings in open court. First, the court found that termination of appellant's parental rights was in B.T.'s best interest because of the likelihood that B.T. would be adopted and because of potential harm to her health and safety should she be returned to appellant. The court then turned to statutory grounds for termination, finding that B.T. had been adjudicated dependent–neglected and had continued outside the home of the parent for more than twelve months despite a meaningful effort by the department, and that conditions that caused removal had not been remedied:

> I'll specifically find that at the time of removal John Timberlake is who she was living with, which obviously caused me a great deal of concern. At this time my concern is the new boyfriend who she engaged in a relationship in . . . the eleventh hour of the case. His criminal history including felony convictions for violence. The fact that he was previously in prison. . . . They met in drug rehab. He obviously has his own set of addictions and problems as does she. . . . [T]hat's really a concern that in the eleventh hour of a case . . . knowing that your parental rights are on the line . . . you would engage in a relationship with someone that you met in drug rehab.
>
> I am concerned about the continued drug usage of the mother late in the case. I'm also concerned . . . that she continued to live with John Timberlake early in the case, from February 2013 through June 2013, knowing that he was a sex offender. . . . I'm also concerned that throughout the case she spent time with people engaged in criminal activity. I was very concerned about the evidence presented where [she] was at a meth lab where she witnessed someone getting shot in the head . . . She did complete a program . . . very, very late in the game. I'll find it eleventh hour compliance. And, like I said, at this time her boyfriend is a felon who just got out of drug rehab.
>
> The other big concern I have is that . . . in the course of this case, . . . close to the year mark there were kids that were in her custody in White County while she was living with John Timberlake in a White County case, and those kids came into

7

foster care. And there's a White County Dependency Neglect Case now and she was in the home at the time those kids were removed . . . .

The court reiterated its finding that it was in B.T.'s best interest to terminate parental rights.

The court's written order of termination set forth two statutory grounds of Ark. Code Ann. § 9-27-341(b)(3)(B):

(i)(*a*) That a juvenile has been adjudicated by the court to be dependent-neglected and has continued to be out of the custody of the parent for twelve (12) months and, despite a meaningful effort by the department to rehabilitate the parent and correct the conditions that caused removal, those conditions have not been remedied by the parent.

(vii)(*a*) That other factors or issues arose subsequent to the filing of the original petition for dependency-neglect that demonstrate that placement of the juvenile in the custody of the parent is contrary to the juvenile's health, safety, or welfare and that, despite the offer of appropriate family services, the parent has manifested the incapacity or indifference to remedy the subsequent issues or factors or rehabilitate the parent's circumstances that prevent the placement of the juvenile in the custody of the parent.

In her first point on appeal, appellant contends that the circuit court clearly erred in finding statutory grounds for termination. She argues that, even if her compliance was eleventh hour, her six-month sobriety left no question that she had remedied the condition causing removal. She points to *Kight v. Arkansas Department of Human Services*, 87 Ark. App. 230, 189 S.W.3d 498 (2004) (*Kight I*), where we reversed an order terminating the mother's parental rights to two children.[2]

---

[2]*See also Kight v. Ark. Dep't of Human Servs.*, 94 Ark. App. 400, 231 S.W.3d 103 (2006) (*Kight II*) (affirming the circuit court's subsequent order terminating Kight's parental rights):

Our prior opinion in this case was largely based on *Trout v. Arkansas Dep't of Human Servs.*, 84 Ark. App. 446, 146 S.W.3d 895 (2004), where we held that the trial court erred by disregarding appellant's eleventh-hour progress made toward reunification.

SLIP OPINION

In *Kight I*, A.W. was removed due to Kight's drug use in July 2002 and L.M. was removed at birth in January 2003 because mother and child tested positive for cocaine. The circuit court terminated Kight's parental rights to A.W. on the statutory grounds that the conditions causing removal had not been remedied and that A.W. had been out of the home for more than twelve months; regarding L.M., termination was due to little likelihood that reunification would result; and as to both children, termination was in their best interests. We concluded that the reason for A.W.'s removal was not that Kight was an unfit parent or unable to care for her child, but drug abuse—which she corrected after A.W.'s removal. We noted that Kight followed the court's directive for treatment following A.W.'s removal by enrolling in Freedom House, where her drug tests were negative from July 2002 through December 2002, but that she but tested positive in January 2003. Following her positive test, she enrolled in Chance Sobriety. CASA originally recommended a ninety-day stay, but she completed six months of residential drug counseling there. The caseworker testified that she was prepared to return A.W. to the home. We noted the testimony of Chance's Ben Perkins regarding Kight's improvement: she had been drug free for the entire program, even after

---

That case, however, was reversed by the Arkansas Supreme Court in an opinion that expressly held that the trial court was not bound to attach significant weight to such tardy improvements, and which restated the fundamental principle that we give great deference to the superior position of the trial court, through observation and extended experience with the parties, to determine whether last-minute efforts are sincere, or instead merely a ruse to prevent imminent termination of parental rights. *Trout v. Dep't of Human Servs.*, 359 Ark. 283, 197 S.W.3d 486 (2004).

*Kight*, 94 Ark. App. at 410–11, 231 S.W.3d at 110 (Pittman, J., concurring).

utilizing unsupervised weekend passes and spending some of them in the home of a man who abused drugs; she had responsibilities in the house, including oversight of other patients' drug testing; and he believed that she would be successful once she reentered society. We noted that A.W. was initially stable with Kight—doing well in her care despite her drug abuse—and was not removed from the home in 2001 when ADHS began its investigation. We concluded that Kight, by maintaining full-time employment while at Chance and remaining clean and sober for over six months, had done exactly what DHS asked her to do. Regarding L.M., we found that the sole reason leading to removal was Kight's one-time drug relapse and that she had corrected the condition leading to removal.

The present case is easily distinguishable from *Kight I* regarding failure to remedy conditions. As the circuit court noted, adjudication occurred in September 2012 and appellant did not complete drug treatment until October 2013. Her live-in boyfriend, Timberlake, had continuing drug issues to the point that ADHS became involved with him and his older children from their home. Appellant did diligently comply with the case plan after B.T.'s removal and did not enter drug treatment until the goal was being changed to adoption, which appellant's caseworker believed was appellant's only motivation for complying. Appellant made no progress until she was in the restrictive environment at Wilbur D. Mills and did not complete drug treatment until B.T. had been out of her custody for over a year. Even on the final day of the termination hearing, she was in a relationship with a former addict and it was unknown if she would remain drug free outside the confines of the rules and regulations of her current inpatient treatment. We hold that the circuit court

SLIP OPINION

did not clearly err in finding that appellant failed to remedy the drug abuse that led to B.T.'s removal.

Appellant also argues that she had no notice of the subsequent-factors statutory ground for termination. This argument is not preserved for review. After twice objecting at the termination hearing to questions regarding her boyfriend, her counsel replied affirmatively when the circuit court specifically asked if the objection was to relevance. We will not address on appeal arguments that were not raised to the trial court. *Lamontagne v. Ark. Dep't of Human Servs.*, 2010 Ark. 190, 366 S.W.3d 351.

As her second point on appeal, appellant contends that the circuit court clearly erred in finding that termination was in B.T.'s best interest and that B.T. would be subject to potential harm if returned to her care. Appellant argues that she substantially complied with the case plan, making the improvements she was asked to make, and that neither her one-time drug relapse nor her relationship with men demonstrated instability.

In finding that potential harm would be caused by returning B.T. to appellant, the court found that appellant had not demonstrated through her eleventh-hour compliance that she was a safe and appropriate placement for B.T. The evidence we have previously summarized demonstrated the risk of potential harm that B.T. would face if returned to appellant. Appellant used drugs and had unstable housing long after the case had begun and continuously made decisions contrary to B.T.'s best interest that prevented returning B.T. to her custody. Fifteen months after the case had begun—while living in the controlled environment of Kay Goss, while receiving counseling and treatment, and despite knowing

11

that it was inadvisable to have a relationship with an addict—she was in a relationship with a recovering addict who was a felon. B.T. had spent the majority of her young life in foster care, a fact attributable to appellant's failure to diligently comply with the case plan, and was bonded with her foster family. Based on appellant's delays in diligently complying, her caseworker believed termination to be in B.T.'s best interest and believed that B.T. would be harmed by a delay in permanency.

The circuit court is not required to find that actual harm would result or to affirmatively identify a potential harm. *Welch v. Ark. Dep't of Human Servs.,* 2010 Ark. App. 798, 378 S.W.3d 290. The potential-harm evidence must be viewed in a forward-looking manner and considered in broad terms. *Dowdy*, 2009 Ark. App. 180, 314 S.W.3d 722. We find no clear error in the circuit court's finding that termination of appellant's parental rights is in B.T.'s best interest, including the consideration of potential harm that would result from returning B.T. to appellant. Ark. Code Ann. § 9-27-341(b)(3)(A).

Affirmed.

HARRISON and GLOVER, JJ., agree.

*Leah Lanford*, Arkansas Public Defender Commission, for appellant.

*Tabitha Baertels McNulty*, Office of Policy & Legal Services, for appellees.