

# ARKANSAS COURT OF APPEALS

DIVISION II
**No.** CV–16–205

| | |
|---|---|
| PATRICIA GARRETT | **Opinion Delivered** SEPTEMBER 14, 2016 |
| APPELLANT | APPEAL FROM THE SALINE COUNTY CIRCUIT COURT [NO. 63JV-2014-312] |
| V. | |
| ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILD | HONORABLE GARY ARNOLD, JUDGE |
| APPELLEES | AFFIRMED |

## DAVID M. GLOVER, Judge

By order entered April 7, 2016, our supreme court granted Patricia Garrett's motion for belated appeal, and this appeal from the termination of her parental rights to her daughter, K.C. (d.o.b. 8-25-2010), followed. She challenges the sufficiency of the evidence supporting the termination, and she also contends she was not provided with adequate accommodation under the Americans with Disabilities Act (ADA) when she was denied more time to complete services. We affirm.

K.C. was taken into the custody of the Arkansas Department of Human Services (DHS) in July 2014. The trial court found probable cause to continue temporary custody following a July 29, 2014 hearing, and then, following an August 25, 2014 adjudication hearing, the trial court found the child was dependent-neglected. The trial court expressed its concern about Garrett's drug use and ordered her to cooperate with DHS and undergo a psychological evaluation. Garrett's refusal to submit to DHS drug screens and undergo an

intensive outpatient drug-treatment program was a continuing problem throughout the case. The goal of the case was changed to termination following a June 22, 2015 permanency-planning hearing. DHS filed a motion to terminate Garrett's parental rights on July 9, 2015, and the termination hearing was held over two days—September 21, 2015, and October 26, 2015. The order terminating Garrett's parental rights was entered November 9, 2015.

At the termination hearing, Dr. Paul DeYoub, a forensic psychologist, testified he had evaluated Garrett; she was forthright and cooperative; she had a history of substance abuse and major depression; and her test results demonstrated "very significant depression, personality problems, substance abuse, difficulty coping, great deal of dependency, feelings of inadequacy, history of unstable abusive relationships, multiple hospitalizations for depression, major depression, methamphetamine abuse and alcohol abuse throughout her adult life." He explained that for her to be an adequate parent, she would have to completely recover from her substance-abuse issues; she would require individual counseling, medication management, and ongoing outpatient treatment for substance abuse; and she would need to be observed for six months to a year to make sure she was no longer drug dependent, no longer needed in-patient mental health treatment, and could avoid abusive relationships. He further explained the child had observed Garrett being beaten by the child's father. He stated if Garrett's only problem were major depression, it could be properly managed and she could care for the child, but she also suffered from dependent-personality issues, substance-abuse problems, and poor relationship choices, which made parenting difficult.

SLIP OPINION

The trial court asked Garrett's counsel if she was still refusing DHS drug screens. Counsel explained she had submitted to drug screening at the Counseling Clinic and she had one test through DHS very early on that was positive and then had refused others administered by DHS.

Kenneth Arnold, a substance-abuse coordinator and counselor, testified his therapeutic relationship with Garrett began on July 13, 2015. He explained she was very attentive and participatory in group; she understood the necessary changes she has to make; she tested positive for methamphetamine when she first came into the program; she was screened every Monday and had received seven tests; and with the exception of the first test, the results had been negative. As of the hearing date, she had completed thirty-two hours of intensive outpatient treatment. Arnold described Garrett's drug use as "moderate," explaining that it had been severe in the past to the point she could not function. He stated she needed to continue the recovery process, but she had maintained sobriety during the three months she had been in the program. He expressed his belief she could maintain sobriety.

Kathleen Armstrong, an adoption specialist for DHS, testified she ran an adoption match for K.C. that came back with 162 possible adoptive family placements, and she felt she would be highly successful in identifying an appropriate family for the child, despite the child's problems with aggression, self-abuse, temper tantrums, and lying.

Boyce Barger, the child's counselor, testified he had been seeing the child since the fall of 2014; the behaviors described by the adoption specialist had been treated with behavior-modification approaches; and there had been a dramatic reduction in the behavior.

He attributed the results to the stability in the foster parents' home. He said he would diagnose the child with adjustment disorder, anxiety, and neglect. He stated the child was very attached to her mother, spoke of her with affection, and wanted to live with her. He expressed his belief that if the child were moved into an adoptive home, her behaviors would restart and need to be addressed again. However, he also stated the child needed to be in a home that provided a very well-defined and appropriate structure with predictable outcomes and consequences for appropriate and inappropriate behavior; and she would need affection. He acknowledged he had not observed Garrett and the child interact, and he would not know if the child had an attachment disorder or like disorder with her mother unless he was able to observe them interact. Barger explained that there were no hard and fast lines where a patient is required to comply with a case plan before beginning family therapy; family therapy would be counterproductive when the case seems about to fall apart because a child needs permanency; and there was never any discussion with DHS about Garrett's progress and the need for family therapy.

Craig Jones, Garrett's licensed certified social worker and outpatient therapist, testified that her compliance had been bumpy; that it went from semicompliant to a long drought of noncompliance to improved compliance. He stated he began to see improved compliance around July 2015, which coincided with her admission into the intensive outpatient drug-treatment program. He explained that Garrett completed parenting and anger management early on but around January 2015, she became inconsistent with services; that she missed her initial intake evaluation for IOP services and then missed several counseling appointments; that she missed her psychological evaluation and a psychiatric

evaluation; that Garrett had not resumed her medication regimen as of August 30; and that he believed it was because she was without funds to pay for the medication (lithium). He said he did not recommend an increase in visitation because more progress needed to be made. He agreed with Dr. DeYoub's opinion that she could potentially parent the child if she completed long-term drug-and-alcohol treatment and got her medication. He stated Garrett had expressed significant doubts about the validity of the drug tests performed by DHS; she agreed to take drug tests administered by other people, just not DHS; he believed her refusal to take the DHS drug test arose out of a feeling of powerlessness, things out of her control, and feeling threatened; and he attributed it to her mental illness, domestic violence, and her child being removed. He stated she was beginning to overcome that sense of powerlessness; she needed to continue counseling, maintain her sobriety and medication and appointments; and he believed she could demonstrate her stability and willingness to improve with additional time. He acknowledged there were two or three times over the course of the case that medication compliance became an issue; failure to maintain her medication regimen could have a profound impact upon her; lithium has a quick washout time in the sense that it does not take long to leave a person's system and reduce its effectiveness; her severe depression returned without medication for a period of time; she has issues dealing with stress; she is redirectable and can calm down with support; her stress-management capacities are somewhat limited; she shuts down and is tearful when stressed; there was one point when she stopped coming to see him because she believed that reunification was hopeless; she became reinvigorated and was doing what she was supposed to do to reunify with her child; some of the missed appointments at the beginning of the

year were because of weather issues; and her medication regimen currently did not include the use of lithium. He said he believed increased visitation could start somewhere around December, and he thought six more months were needed to get to a trial home visit.

Erin Descoteaux, caseworker, testified she was assigned to the case at the end of August 2015; she had reviewed the file and ascertained that Garrett's progress with the case plan was as follows: she completed parenting and anger-management classes; she participated in a drug-and-alcohol assessment as well as a psychological evaluation; she participated in intensive outpatient drug treatment and was still in counseling at the Counseling Clinic; she had her own home; she had Social Security income; she attended AA/NA meetings; and since the last hearing in September she had taken two drug screens for DHS, both of which had been negative. She stated the petition to terminate was filed on July 9, 2015. She explained Garrett did not begin intensive outpatient drug treatment until July 13, 2015. She stated counseling and outpatient drug treatment were the only two services that were not completed prior to the filing of the petition to terminate but that those were the two most significant areas of concern. She said Garrett had appropriate housing and had been appropriate at visits with the child throughout the case, but she had not paid any child support. She stated she was aware Garrett was submitting to drug screens at Counseling Clinic and she trusted those test results. She stated Garrett has mental-health issues. She acknowledged that DHS is subject to the Americans with Disabilities Act; that Garrett had completed most of her services but they needed to see a long period of stability in her services, sobriety from all substances, stable mental health, and maintenance of her medications and counseling. She explained they had asked Garrett for names of relatives

who might be able to take the minor child, and she provided her adult son's name; there were no problems with his background checks, but he lived with her and they did not know if he had the means to support the child on his own. She acknowledged the child receives Social Security benefits from her mother, and those benefits would be considered when assessing whether her brother could financially support her.

Garrett testified she visits with her child every Friday; she missed one visit because she was incarcerated for failing to appear on a shoplifting charge; she was not able to consistently participate in services because of transportation issues; she did not realize DHS would provide transportation; and she did not want to start services if she could not be consistent and did want to rely on other people two and three times a week. She explained she refused to take drug screens for DHS because she lost power in every part of her life and the one thing she could grasp onto was her resentment of DHS for doing this; it was not until she realized her child could be taken away forever that she realized what she was doing was wrong; she realizes it was her fault the child was taken into care, not DHS's; she has accepted responsibility, and it has helped her in counseling; she was more than willing to move out of her house so that her twenty-one-year-old son could have her daughter with him; and if things go well, and she is able to move back in, her son could be her support system. She stated her father was helping her son get a truck; she has family support; she speaks with her dad every day; and her sister originally took the child but brought her back when she got mad at Garrett because Garrett told her she was "going to beat her ass if she didn't quit acting the way she was." She said she got rides from DHS employees during the day, but did not realize they would assist her after hours until she learned of that service

at a staffing. She said she provides for herself financially from her disability and by selling items on eBay; she might have joked about getting money another way, but she was being sarcastic. She acknowledged she had violated the court's order by refusing to submit to drug screens for DHS. She also acknowledged her son was taken from her care as a child; her mother had guardianship of him; and she got him back. She stated if the court gave her more time to get K.C. back, she would continue to cooperate; she feels she is making progress with Craig Jones; she also liked working with Ken Arnold; she has not used drugs for a while; and there was a time her services were delayed because Counseling Clinic burned and all the records had been lost.

During closing arguments, Garrett's counsel commented, "Your honor we did bring to your attention the Americans with Disabilities Act. While I agree that we did not make a request for reasonable accommodations to the Department, I do not think the Department can provide us with the one accommodation my client needs and that is a greater amount of time to complete services than the ordinary individual would require. Only you can order that accommodation and that is what we are requesting."

For her first point of appeal, Garrett contends the trial court erred in granting the petition to terminate her parental rights. We disagree.

The trial court terminated the rights of both parents. This appeal involves only the mother. In pertinent part, the trial court found the following statutory grounds had been proved: 1) that the child had been adjudicated dependent–neglected and continued out of the parent's custody for twelve months, and despite meaningful efforts by DHS to rehabilitate and correct the conditions that caused removal, those conditions had not yet

been remedied by the parent; 2) that the child had lived outside the parent's home for a period of twelve months, and the parent willfully failed to provide significant material support in accordance with the parent's means; and 3) that other factors and issues arose subsequent to the filing of the original petition for dependency-neglect that demonstrate that placement of the juvenile in the custody of the parent was contrary to the juvenile's health, safety, and welfare and that, despite the offer of appropriate family services, the parent had manifested the incapacity and indifference to remedy the subsequent issues or factors or rehabilitate the parent's circumstances that prevented placement of the juvenile in the parent's custody. In addition, the trial court found that termination was in the child's best interest, considering the likelihood the juvenile would be adopted and the potential harm to the health and safety of the juvenile caused by returning her to the parent's custody.

Our review of cases involving the termination of parental rights is de novo. *Harbin v. Arkansas Dep't of Human Servs.*, 2014 Ark. App. 715, 451 S.W.3d 231. A trial court's termination of parental rights must be based on factual findings proven by clear and convincing evidence. *Basham v. Arkansas Dep't of Human Servs.*, 2016 Ark. App. 232, 490 S.W.3d 330. We will not reverse a trial court's ruling as to termination unless it is clearly erroneous. *Id.* In order to terminate parental rights under Arkansas law, a trial court must find that at least one statutory ground for termination has been established and that termination would be in the child's best interest. *Id.* In determining the best interest of the child, the court must take into consideration the likelihood of adoption and the potential harm to the health and safety of the child that would be caused by return to custody of the parent. *Id.*; Ark. Code Ann. § 9-27-341(b)(3)(A) (Repl. 2015). Credibility determinations

are left to the fact-finder. *Harbin*, *supra*. Only one statutory ground is necessary to terminate parental rights. *Vail v. Arkansas Dep't of Human Servs.*, 2016 Ark. App. 150, 486 S.W.3d 229.

Here, the trial court found as one statutory ground that K.C. had been adjudicated dependent-neglected and continued out of Garrett's custody for twelve months, and despite meaningful efforts by DHS to rehabilitate and correct the conditions that caused removal, those conditions had not yet been remedied by the parent. Another ground the trial court found was that other factors and issues arose subsequent to the filing of the original petition for dependency-neglect that demonstrated placement of the juvenile in the custody of the parent was contrary to the juvenile's health, safety, and welfare and that, despite the offer of appropriate family services, the parent had manifested the incapacity and indifference to remedy the subsequent issues or factors or rehabilitate the parent's circumstances that prevented placement of the juvenile in the parent's custody.

We are not left with a definite and firm conviction the trial court made a mistake with respect to either ground. As previously mentioned, proof of only one ground is sufficient to terminate, making it unnecessary to discuss the remaining ground found by the trial court involving lack of material support. As noted by the trial court in its order, K.C. was removed from Garrett on July 25, 2014; Garrett tested positive in her first court-ordered drug screen, and then refused to participate in the remaining DHS drug screens ordered by the court; she did not participate in DHS drug screening until October 2015, which even though it was negative, was performed after the petition to terminate had been filed; drug screens that are refused are deemed to be positive; Garrett's therapist, Craig Jones, testified

he could not recommend increased supervised visitation until he had seen months of progress; and Dr. DeYoub opined that Garrett's treatment needed to continue for a minimum of six months and as long as a year to prove she was stable, compliant with mental-health treatment, and not relapsing into substance abuse. The court found it unreasonable to have the child wait another six months to a year to see if Garrett was able to maintain her sobriety and her mental health. The trial court further found that at the time the child was removed, a hair-follicle test was positive for methamphetamine; that Garrett also tested positive for methamphetamine; that Garrett had refused the random DHS drug testing; that she only began outpatient drug treatment after the termination petition had been filed; that during the period from January 2015 to mid-July 2015, she participated in no drug treatment or NA/AA meetings, and only recently began complying with the medication-management regimen outlined by her psychiatrist; that K.C.'s behavioral issues were related to the neglect she suffered from the mother; that K.C.'s behavior had improved dramatically with appropriate behavior modification and stability received in foster care; and that no family-therapy sessions were undertaken because it would be counterproductive to do so when Garrett was not participating in the case plan and the case was about to fall apart, as explained by Mr. Barger. The trial court determined that Garrett's lack of participation in services and consistent treatment indicated her incapacity or indifference to remedying the factors that prevented K.C.'s placement with her.

With respect to the trial court's finding that it was in the child's best interest to terminate Garrett's rights, the trial court noted Cathleen Armstrong testified 162 families were interested in adopting a child with similar characteristics, and Armstrong anticipated

being highly successful in finding a match between the child and an adoptive family. The trial court further relied upon the testimony of Descoteaux and Dr. DeYoub in demonstrating that the child would be at risk of potential harm if she were returned to Garrett. Again, we are not left with the conviction that the trial court made a mistake.

The intent of our termination statute is to provide permanency in a minor child's life in circumstances where returning the child to the family home is contrary to the child's health, safety, or welfare, and where the evidence demonstrates that the return cannot be accomplished in a reasonable period of time as viewed from the child's perspective. *Harbin*, *supra*; Ark. Code Ann. § 9-27-341(a)(3). The child's need for permanency and stability may override the parent's request for additional time to improve the parent's circumstances. *Id.* The issue is whether the parent has become a stable, safe parent able to care for the child. *Id.* The court may consider the parent's past behavior, and even full compliance with the case plan is not determinative. *Id.*

Garrett appears to have finally realized the seriousness of the case when the goal was changed to termination—July 2015. While from that point forward she seems to have applied herself to remedying her substance abuse and mental-health issues, her eleventh hour efforts were simply too late. *See, e.g., Villanueva v. Arkansas Dep't of Human Servs.*, 2014 Ark. App. 401, 439 S.W.3d 65. There was testimony from Dr. DeYoub that another six months to a year would be necessary to make sure she was no longer drug-dependent, could stay out of mental hospitals, and could avoid abusive relationships. The trial court was justified in balancing all of those factors against the child's need for stability and permanence. Garrett has not convinced us that the trial court clearly erred in terminating her parental rights.

SLIP OPINION

For her remaining point of appeal, Garrett contends the trial court failed to provide an adequate accommodation under the Americans with Disabilities Act when it refused to allow her more time to complete services. We do not address the issue because it was not preserved for our review. As demonstrated earlier in this opinion, Garrett never properly developed this ADA argument before the trial court nor did she receive a ruling on the issue. She is therefore prevented from raising it on appeal. *Woodall v. State*, 2011 Ark. 22, 376 S.W.3d 408.

Affirmed.

HARRISON and VAUGHT, JJ., agree.

*Wallace, Martin, Duke and Russell, PLLC*, by: *Valerie L. Goudie*, for appellant.

*Jerald A. Sharum*, Office of Chief Counsel, for appellee.

*Chrestman Group, PLLC*, by: *Keith L. Chrestman*, attorney ad litem for minor child.