

# ARKANSAS COURT OF APPEALS

DIVISION IV
No. CV-17-561

| | |
|---|---|
| KARESHA HORTON<br>**APPELLANT**<br><br>V.<br><br>ARKANSAS DEPARTMENT OF<br>HUMAN SERVICES AND MINOR<br>CHILD<br>**APPELLEES** | **Opinion Delivered:** November 15, 2017<br><br>APPEAL FROM THE SCOTT<br>COUNTY CIRCUIT COURT<br>[NO. 64JV-15-39]<br><br>HONORABLE TERRY SULLIVAN,<br>JUDGE<br><br>AFFIRMED |

## WAYMOND M. BROWN, Judge

Appellant appeals from the termination of her parental rights to E.H., born 09/01/2015.[1] On appeal, she argues that the circuit court erred in (1) terminating her parental rights based on the failure-to-remedy ground, (2) finding that DHS had shown the subsequent-factor ground, and (3) denying her motion for a second psychological evaluation as untimely. We affirm.

### I. *Facts*

The hotline was called on October 7, 2015, due to concerns that E.H. was not being fed properly. According to family service worker (FSW) Laura Case, appellant could explain how to mix E.H.'s formula, but "could not do it in practice." Appellant reported that she fed E.H. four ounces of formula every two hours, which was appropriate. However, FSW

---

[1]The parental rights of E.H.'s father, David Armstrong, were terminated in the same order. Armstrong is not a party to this appeal.

Jennifer Williams reported "major concerns" regarding whether E.H. was being properly fed because she was being weighed regularly with no weight gain.

Dr. Sara Robinson admitted E.H. to the hospital on October 14, 2015, for failure to thrive due to not being fed properly; she wanted to observe appellant feeding E.H. and wanted E.H. to be weighed daily.[2] There was "concern for [appellant's] mental capacity as it relates to her ability to care for E.H." Appellant was "on SSI for learning disabilities" that reportedly affected her ability to read and write. A seventy-two-hour hold was taken on E.H. on October 14, 2015, due to her failure-to-thrive diagnosis. Appellee Arkansas Department of Human Services (DHS) filed a petition for emergency custody and dependency-neglect on October 19, 2015, which was granted by the circuit court's ex parte order for emergency custody entered on the same date.

A probable-cause order was entered on October 21, 2015, finding probable cause that emergency conditions existed that necessitated E.H.'s removal and that those conditions continued. In its December 8, 2015 adjudication and disposition order, the circuit court adjudicated E.H. dependent-neglected "as defined in the Arkansas Juvenile Code" and made specific findings. Appellant was ordered to complete a number of standard duties, including submitting to a psychological evaluation and following any recommendations. DHS was ordered to provide "specialized parenting classes to [appellant] to focus on raising a baby." Tammy Tolleson, appellant's mother, was added to the case plan "since [appellant] lives

---

[2]E.H. gained four ounces from one night in the hospital.

with her and [Tolleson] participated in caretaking for [E.H.] before the hold was taken."

The goal of the case was reunification.

In its February 24, 2016 and August 12, 2016 review orders, the goal of the case remained reunification. In the latter review order, the circuit court found:

> That [appellant] has complied with the caseplan in that she has submitted to a psychological evaluation, completed specialized parenting classes and attended counseling. The psychological evaluation determined that [appellant] is functionally illiterate, that she cannot live independently and requires supervision of her child care. The maternal grandmother has agreed to act as a supervisor of [appellant's] child care[.]

DHS agreed to allow appellant to have visitation with E.H. "during the week, with the child to return to the foster home on weekends." The circuit court gave DHS the authority to begin a trial placement if the visitation went well.

On December 6, 2016, appellant filed a motion for a second psychological evaluation and a motion for a continuance. She requested that a second and independent psychological evaluation be performed as a reasonable accommodation pursuant to the Americans with Disabilities Act.[3] She asserted that the first psychological evaluation had been completed before she submitted to services and provided "little flexibility for [appellant] and DHS to achieve a form of reunification." She asserted that it would be prejudicial to her to use only the initial psychological examination "[g]iven that [she] has submitted to services; given that she is a disabled individual entitled to a reasonable accommodation pursuant to the ADA; and given that the State has a policy that mental incapacity is a basis for termination of parental rights."

---

[3]Americans with Disabilities Act of 1990, 42 U.S. §§ 12101–12213 (2013).

On December 8, 2016, DHS filed a petition for termination of appellant's parental rights, citing two grounds. The first ground was failure to remedy the cause for removal.[4] DHS stated that "[a]lthough [appellant] completed the tasks in the case plan, she ha[d] not successfully utilized the skills she learned the parenting classes, counseling or from homemaker services." It also noted that E.H. had a "continuous problem" with diaper rash that was "constant and worsening" and that appellant gave incorrect instructions on the application of the prescription provided for the rash, after DHS suggested—and she went— to the doctor. DHS's second asserted ground was the other-factors ground.[5] It went on to state that during the trial home placement, appellant "did not provide the most basic care for her child resulting in circumstances that were contrary to the juvenile's health, safety or welfare."

On December 9, 2016, the circuit court entered its permanency-planning order in which it changed the goal of the case plan to adoption. It noted testimony from Nancy Mondragon, employed by First Kids Daycare, that (1) E.H. would be brought to daycare "dirty"; (2) E.H. would "exude an odor" requiring workers to "wipe down her whole body with baby wipes"; and (3) appellant would bring bottles of "regular milk"—before E.H. turned one—in a bottle that would be "dirty and crusted with milk." Mondragon stated that workers had spoken with appellant "several times about the cleanliness of the bottle and the fact that they could not give a child regular milk before the child's first birthday," yet

---

[4]*See* Ark. Code Ann. § 9-27-341(b)(3)(B)(i)(*a*) (Repl. 2015).

[5]*See* Ark. Code Ann. § 9-27-341(b)(3)(B)(vii)(*a*).

appellant "continued to bring a dirty bottle with regular milk." The circuit court found Mondragon's testimony "very credible."

It also noted testimony from FSW Carol Harp that appellant had complied with the case plan and court orders, leading to a trial home placement, but E.H. was removed from the placement on September 23, 2016. She noted visiting appellant's home on that day—which was "very hot"—and seeing various safety hazards including a fan without a cover blowing on E.H. Appellant had claimed that the cover was only missing because she had washed it and it was drying, but FSW Bridget Warren had reported seeing the same safety hazard during her visit the previous day. Appellant had obtained a prescription-strength diaper cream for E.H. and had advised daycare workers—and stated to Harp—that it was to be applied at "every" diaper change, but the bottle said twice per day. Furthermore, she testified that appellant intended to give E.H. baby Orajel without consulting doctor, though the box advised not doing so for a child under two; and that she was concerned about Tolleson's ability to supervise appellant's parenting because Tolleson has a prescription for and was taking "multiple hydrocodone pills per day."[6]

In the permanency-planning order, the circuit court found that appellant had complied with the case plan and its orders, stating specifically that she had done "everything" DHS or the circuit court had asked her to do, but went on to state:

> [E.H.] is not safe with her at this time. [Appellant] does not understand when medication should be administered. She is either not bathing [E.H.] or not bathing her properly. She was not properly cleaning the bottle she was taking to day care. She either does not understand or is ambivalent to the fact that piles of clothing, a very hot home, electrical wires, and exposed fan blades could be dangerous to a baby.

---

[6]Warren also testified, but her pertinent testimony was duplicative.

SLIP OPINION

Despite these findings, and its order setting a termination hearing, it ordered DHS to continue to offer reunification services to appellant, "including looking for someone or some institution that would appropriately supervise [appellant's] parenting." It maintained that it was "very concerned about the condition of the home[.]"

DHS responded in opposition to appellant's motions for a second psychological evaluation and for a continuance on December 12, 2016, asserting that appellant's requests had "no basis on law or in fact," specifically arguing that "to the extent that [appellant] attempts to characterize her request for a continuance as reasonable accommodation, a second psychological examination is not a "reasonable accommodation as contemplated by the ADA" since appellant "ha[d] not argued that a second psychological evaluation would allow her meaningful access to services" and did not list any services that should be offered. DHS denied that the initial psychological evaluation limited its flexibility, but averred that DHS used the recommendations therein to develop further services for appellant, which it detailed therein.

A status hearing was held on December 13, 2016, initially scheduled for purposes not pertinent to this appeal; however, the circuit court addressed appellant's motions at the start of the hearing. Appellant argued that she was entitled to reasonable accommodations under the ADA and that she was seeking a second psychological evaluation because she did not have the "financial ability or the resources to provide [one] for herself in her defense." She argued that a statement in the initial evaluation that appellant "cannot parent the child alone" was a limit that DHS relied on in providing services, visitation, and trial home placement to appellant. In pertinent and nonduplicative part, DHS argued that the motions

were untimely; the ad litem agreed. From the bench, the circuit court made the following findings:

> Well, I tend to agree with [DHS] and the ad litem. I think one thing we're forgetting is about permanency for this child. We're now, the best I can tell, this case was filed October 19, 2015. The child would've been taken a few days prior to that. We're almost now 14 months into this case. The psychological that we're talking about, as Mr. Landon said, was November 2015. I appreciate Ms. Standridge and she's vigorously representing her client, but I don't think it's timely. It's filed about 13 months after the psychological. I think [DHS]—I'm certainly not—made up my mind what I would do on the termination hearing, but [DHS], I assume, is still continuing to provide services to the mother as I've ordered and they'll do so. And I don't know that there's any prejudice under the ADA. I'd have to consider the best interest of this child and this child deserves permanency. So I am going to deny your motion. I don't know if a second psychological would not say the same as the first. I don't know. I don't think it's timely[.]

The termination-of-parental-rights hearing was held on January 10, 2017. Where not duplicative of facts already given, pertinent testimony was as follows.

Dr. Robert Spray, Jr., testified that he conducted appellant's psychological evaluation. He diagnosed her with intellectual disability—based on her "low level of cognitive functioning"—and unspecified anxiety disorder—due to his inability to tell the nature of her self-reported "ongoing chronic anxiety." He stated that appellant's "ability to independently care for herself in that the low intellectual functioning in and of itself by itself does not suggest a problem[,]" but appellant "has some difficulty in carrying out"; "she could give strategies for doing things but she couldn't explain how she could carry those strategies out in situations." He recommended counseling as far as her ability to improve and understood that appellant had some parenting classes, but he stated that "there was no way for him to know based on [that] what the outcome would be."

As far as parenting E.H., Dr. Spray recommended that appellant "would need supervision by a competent adult living in the home" and he did not know for how long into the future. The supervising adult would have to be "competent and capable and be able to see to the child, because that adult will have to be as much of a caretaker" as appellant.[7] He would have concerns for E.H.'s safety if she was returned to appellant without adult supervision, including, but not limited to (1) appellant being able to pay attention consistently to what was going on with the child and what the child was doing, (2) issues with dosing medications because appellant has low math and verbal reasoning skills, and (3) appellant's anxiety disorder, which he did not know the status of treatment for, but which "would play a role in being able to pay attention enough to [E.H.]" He believed appellant would know what a danger was, but would "maybe have difficulty following through with any plans that she would have to protect the child."

Dr. Spray did not have enough information available to him to give a prognosis for appellant in being able to improve to the point where she could independently care for her child. He stated that a second psychological evaluation "would not provide better insight as to whether she benefited from services" because the "issue is parenting and the parenting part of the evaluation was difficult" because of appellant's low cognitive functioning. However, he admitted that "[i]t's possible, [he] guess[ed]" that if appellant could comprehend and improve through more education and training, the psychological

---

[7]This statement came from questioning by the circuit court regarding Dr. Spray's questioning in appellant's psychological evaluation of whether Tolleson's supervision was inadequate, specifically stating "if they were living with her mother, why did her mother not see the problem and intervene?"

evaluation "might" be different, but the "only way to know that is, in fact, a second psychological evaluation is conducted."

Mondragon testified that appellant or Tolleson would bring E.H. into daycare dirty "almost daily." E.H. had dirt under her fingernails which "wasn't normal for a child [E.H.'s] age"; she was not walking. She noted that when the facility told appellant it could not give whole milk to a child under one-year old, appellant "was bringing her own cup with whole milk" because she "thought if she brought the whole milk that would be okay." She testified that she "never thought it necessary to call DHS or the hotline that [sic] E.H. wasn't being cared for"; she was "never concerned that [E.H.] was unsafe in [appellant's] home." However, she admitted that the problems seen at the facility "were there since [they] started seeing E.H." and they "lasted quite a while."

Holly Laird testified that appellant was bringing E.H. in for weight checks with the WIC program, which gives parents information on how to feed their baby for the first year of life. Though she was concerned about E.H., who was "very underweight," she did not make a hotline call. The program was not sure if there was a medical issue or a feeding issue. E.H. was "clean, appropriately dressed" during her visits.

Case testified that DHS was concerned early on with ADA, so it did early-childhood intervention for the baby. Appellant never asked for ADA accommodations; DHS was "just taking proactive steps in case that should happen," to go "above and beyond so that it wouldn't be an issue in the case." While appellant progressed to unsupervised visitation and though DHS "very clearly" asked Tolleson to supervise appellant and let them know of any problems, she "didn't see any improvements" in the behavior of appellant or Tolleson.

Tolleson was giving E.H. table food at only four or five months old and smoking in the home. She continued to smoke in the vehicle she used to transport E.H. once she stopped smoking in the home, despite being told "from day one that there could be no smoking around [E.H.]" Case temporarily ended in-home visitations; appellant did improve some after resuming in-home visitations, but with additional requirements added to the visitations. She did not authorize the trial home placement, but someone after her did.

Stephanie Holland, employed with the Department of Child and Family Services, testified to being the person who worked one-on-one with appellant for her parenting classes and worked with her up until the trial home placement. She assisted with applications, like for food stamps and "housing authority." She helped appellant with a budget because appellant looked at the option of getting her own place but getting her own place "wasn't feasible."[8]

Holland stated that she referred appellant for nutrition classes and that she attended the first two classes, but not the last class; she never rescheduled. Likewise, with counseling, it was not being followed up on like it should have been. And after eight months of Literacy Council, when appellant and her mother were informed that they would have to transport appellant to the program once the trial home placement started, appellant "just quit"; she "didn't have the support system to help her continue." Despite budgetary issues, there was a plan to correct the issues between appellant and Tolleson; however, "appellant never

---

[8]Tolleson had put some utility bills in appellant's name and some overdue bills had not been paid. Tolleson was keeping all of appellant's check except approximately $113 per month for appellant's personal items. Despite one other adult sibling living in the home, appellant's check was "kind of carrying half of the household."

followed through on it." Appellant had no understanding of finances and "depend[ed] on [Tolleson] for that." The "only problem" was that appellant "would want to do these things but she didn't have the backing to do it."

Holland testified that she would have concerns with E.H. being returned to appellant due to "lack of support" and what happened in the trial home placement when the case "just went south." Another issue she had was that it was her "understanding that [Tolleson] was supposed to be [appellant's] support mechanism" and she knew Tolleson "had knowledge of this," but issues were still arising.[9]

Appellant testified that she was twenty-three years old. E.H. had to be put in the hospital for lack of weight gain, and they put her on a "Similac-soy based formula and it was causing her to lose weight," but "when [they] got in the hospital, they changed it and [E.H.] started gaining weight." She stated that she had lived in an apartment by herself before and denied living with Tolleson since she was a baby, though she lived with her mother now in addition to her sister and her grandmother, who was sick but was "getting better sort of." She paid her own rent from her $750.00 disability check; her mother would "hand the check to [her] and [she] would go pay everything." She denied that DHS provided her any financial assistance to pay the bills that were in her name so she could get her own place and stated that "[w]hen [she] was in [her] own place HUD paid for it"; she just paid "whatever [she] had to pay." DHS did not help her find another person "to take

_____

[9]Holland noted that appellant's body odor was documented as a medical condition and an appointment was set, but appellant never went; there were two times E.H. had a double ear infection; and there were two times when Tolleson was gone "nearly a week at a time with a new boyfriend" leaving appellant with her sixteen-year-old sibling only.

care of [her] social security money." She stated that "[t]here could have probably been other services [DHS] could have offered [her]," but "[n]ot anything [she could] think of." When people tell appellant to do something different with E.H., she "[tries] to do what [she] can"; she is "capable." She would be willing to have a "24/7 aide," if she qualified, and was willing to get help from places other than Tolleson. She thought she was "capable enough." "With people's help," she so believed.

Appellant asserted that the rash-cream instruction mistake was because she did not realize she handed the daycare worker both a "butt paste" and a prescription. On that particular morning, she asserted that E.H. did not have a diaper rash when she went to daycare, though she had one when she returned, so she went to the doctor. Regarding the whole milk before E.H. was one year old, she denied that it was a whole bottle of whole milk; "just with water and a little bit." She first asserted that a "doctor told [her] to start introducing" whole milk to E.H., but then testified "[a]s to who told me how to do it, well, I went to parenting classes and stuff and I just try to do everything. I didn't just do that on my own, someone told me something that I thought was okay."

Appellant acknowledged that Tolleson "was supposed to be there to help" her during her trial home placement. While she denied that Tolleson was with her boyfriend—eventually admitting that Tolleson would go to be with her boyfriend—she stated that Tolleson "was there but she wasn't there." She acknowledged discussing with her attorney that Tolleson "might not be the right person for [her] to be with and [Tolleson is] not." When asked if she planned to continue to live with Tolleson and appellant's grandmother, she stated that she looked into some places, "but the care that everybody wants is not what

they have."[10] She had recently had a family friend take her to check out some services in Mena; she did not notice he was drunk "until someone said something."

Harp, appellant's current caseworker, testified to giving appellant information for First Steps Pregnancy and Resource Center in Mena because they "have more intensive one-to-one parenting as well as life skills[,]" and the Polk County Developmental Center "was taking a little bit longer and [DHS] wanted to get [appellant] some services quicker" because time was "critical." When Harp spoke to the director of the program about appellant's needs, the director "didn't realize" that appellant needed "a continual process" as the program was a 12- to 18-month program that "transitions out," so they would not be able to help appellant "as far as 24-hour, you know, live in somewhere and stay there."

Harp testified that there were concerns "along the way" of the trial home placement, but DHS was "kind of working with" appellant and fixing the problems as they arose. Those concerns included (1) appellant's inability to discern that a person had been drinking and that it was a danger to get into car with that person driving; (2) that multiple dogs and puppies were in the home during the trial home placement and "[p]oop was everywhere," and she "was not exaggerating"; and (3) appellant's inability to recognize safety hazards.[11]

---

[10]She submitted a letter from her landlord verifying that she had housing, having moved in on December 1, 2016; however, the letter stated that she lived in the home with Tolleson, Della Garcia, and Kayla Horton.

[11]Examples given included a wooden crate with wires sticking out of it being on the floor at a time when E.H. could begin crawling, appellant placing her bed so that the headboard blocked the only other exit in the room, and an "air conditioner with the front of it, exposed wires, a fan clipped to it."

SLIP OPINION

The "pattern for [appellant was] that [Harp] would confront her on something, if [appellant] realized that she hadn't—she had said the wrong thing, she would change it."

Despite some potential options that had not been explored, Harp did not think it premature to recommend termination of appellant's parental rights because they were fifteen months into the case, and even if there were other possibilities, there were no guarantees that they could be set up or that appellant would follow through. Appellant's counsel advised Harp of a program in Van Buren that currently provides 24/7 care to a disabled gentleman and his two-year-old child; however, counsel admitted to the court that she had not brought up this program to Harp. Harp testified that no one ever suggested that she check any specific program and no one ever said "[appellant's] disabled, we want this particular accommodation or we want you to accommodate her because she is disabled." At the last hearing, an assisted-living place had been brought up as an option and Harp had researched that, finding no place that would take a client as young as appellant and none that would make an exception for her with the inclusion of E.H. Harp did not believe appellant was ready for reunification or to live on her own with E.H.

Appellant moved for a directed verdict after Harp's testimony; the circuit court denied the motion. From the bench, the circuit court made the following pertinent findings:

> This child has been adjudicated dependent-neglected due to failure to thrive. This case now is going on its 15th month. The Department has provided a myriad of services to the mother. The record is replete with all the services. The mother, based on the testimony of the psychologist, Dr. Spray, has a low level of cognitive skills. She would need supervision by a competent adult in order to parent her child. And Dr. Spray had indicated that he would be concerned about who that person was because the mother of the mother was in the home when the child was taken. The testimony is replete even from the mother today that her mother is not an appropriate caregiver for her. She needs an appropriate -- she needs a caregiver. She cannot read, she has no driver's license, I believe she's a very nice person but she is low

functioning. She has a low level of cognitive skills. And as Dr. Spray said she'd need supervision by a competent adult in order to raise her child.

. . . .

The child's been outside the home -- we're in the 15 months – for more than 12 months. There's been subsequent factors. . . . I know, ma'am, you love your baby very much. But I have to find what's in the best interest of this child. And if I thought we could continue this case for another three months or six months or whatever, or a situation that you can parent the child, I would certainly consider it. But this child needs permanency.

This child needs a safe environment, a place where the -- from both parents and where the child can be cared for. This child is, I believe about 14 or 15 months old. A little bit over that. This child needs permanency. I find reasonable efforts on behalf of the Department, more than reasonable efforts to accommodate. Especially to accommodate the mother with her disabilities. But I don't know anything more that the Department could possibly do.

It then found termination of appellant's parental rights to be in the best interest of E.H.

The circuit court entered an order denying appellant's motions for a second independent psychological evaluation and a continuance on February 6, 2017.[12] The circuit court entered its order terminating appellant's parental rights on April 6, 2017. Therein, it found that DHS had proven both grounds alleged in the petition. Appellant filed a motion for reconsideration and/or for a new trial on April 11, 2017, based on records from the Fresh Start program, which she "was engaged and participating in . . . at the time of the

---

[12]This order was virtually identical to the circuit court's status order entered on January 17, 2017; however, the February 6, 2017 order added a Rule 54(b) certificate. Neither party raises the issue of the Rule 54(b) certificate on appeal; however, this court addresses it here because, if valid, it would be a final order from which appellant failed to appeal. A review of the certificate shows that it was not valid because it merely tracked the language of the rule and did not make specific factual findings. *See Albarran v. Liberty Healthcare Mgmt.*, 2013 Ark. App. 598, at 4 (citing *Cruse v. 451 Press*, LLC, 2010 Ark. App. 115).

termination hearing," and had since, "successfully completed" so that she can "safely and appropriately parent her child." The accompanying documentation stated that appellant began the program on January 16, 2017. DHS responded in opposition to the motion on April 17, 2017. The circuit court denied the motion in its order entered on April 25, 2011. This timely appeal followed.

## II. *Standard of Review*

The standard of review in appeals of termination of parental rights is de novo, but we reverse a trial court's decision to terminate parental rights only when it is clearly erroneous.[13] A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a distinct and firm conviction that a mistake was made.[14] Grounds for termination of parental rights must be proven by clear and convincing evidence, which is that degree of proof that will produce in the finder of fact a firm conviction of the allegation sought to be established.[15] The appellate inquiry is whether the trial court's finding that the disputed fact was proven by clear and convincing evidence

---

[13]*Shaffer v. Ark. Dep't of Human Servs.*, 2016 Ark. App. 208, at 3, 489 S.W.3d 182, 184 (citing *Ullom v. Ark. Dep't of Human Servs.*, 340 Ark. 615, 12 S.W.3d 204 (2000); *Mitchell v. Ark. Dep't of Human Servs.*, 2013 Ark. App. 715, 430 S.W.3d 851; *Brewer v. Ark. Dep't of Human Servs.*, 71 Ark. App. 364, 43 S.W.3d 196 (2001)).

[14]*Id.* (citing *Wade v. Ark. Dep't of Human Servs.*, 337 Ark. 353, 990 S.W.2d 509 (1999); *Knuckles v. Ark. Dep't of Human Servs.*, 2015 Ark. App. 463, 469 S.W.3d 377; *Hopkins v. Ark. Dep't of Human Servs.*, 79 Ark. App. 1, 83 S.W.3d 418 (2002)).

[15]*Greenhaw v. Ark. Dep't of Human Servs.*, 2016 Ark. App. 294, at 2–3, 495 S.W.3d 109, 111 (citing *Hughes v. Ark. Dep't of Human Servs.*, 2010 Ark. App. 526).

SLIP OPINION

is clearly erroneous.[16] In resolving the clearly erroneous question, the reviewing court defers to the circuit court because of its superior opportunity to observe the parties and to judge the credibility of witnesses.[17]

Termination of parental rights is a two-step process requiring a determination that the parent is unfit and that termination is in the best interest of the child.[18] The first step requires proof of one or more statutory grounds for termination; the second step, the best-interest analysis, includes consideration of the likelihood that the juvenile will be adopted and of the potential harm caused by returning custody of the child to the parent.[19] Only one statutory ground is necessary to terminate parental rights.[20] Appellant does not contest the best-interest finding made by the trial judge, so if either ground found by the circuit court to be supported by clear and convincing evidence is not clearly erroneous, we are compelled to affirm.

---

[16]*Id.* at 3, 495 S.W.3d at 111 (citing *J.T. v. Ark. Dep't of Human Servs.*, 329 Ark. 243, 947 S.W.2d 761 (1997)).

[17]*Houseman v. Ark. Dep't of Human Servs.*, 2016 Ark. App. 227, at 3, 491 S.W.3d 153, 155 (citing *Brumley v. Ark. Dep't of Human Servs.*, 2015 Ark. 356, at 7; *Dinkins v. Ark. Dep't of Human Servs.*, 344 Ark. 207, 213, 40 S.W.3d 286, 291 (2001)).

[18]*Id.* at 2, 491 S.W.3d at 155 (citing *Harbin v. Ark. Dep't of Human Servs.*, 2014 Ark. App. 715, at 2, 451 S.W.3d 231, 233).

[19]*Id.* (citing Ark. Code Ann. § 9-27-341(b)(3)(B), (b)(3)(A) (Repl. 2015); *Harbin, supra*).

[20]*Beard v. Ark. Dep't of Human Servs.*, 2016 Ark. App. 467, at 7, 503 S.W.3d 89, 93 (citing *Sanford v. Ark. Dep't of Human Servs.*, 2015 Ark. App. 578, 474 S.W.3d 503).

### III.  *Failure to Remedy*

Appellant's first argument on appeal is that the circuit court clearly erred in terminating her parental rights based on failure to remedy because failure to thrive was the condition that caused the removal and that condition had been remedied. This court does not agree.

The failure-to-remedy ground provides that termination is appropriate if the court finds, by clear and convincing evidence, that the juveniles have been adjudicated dependent-neglected and have continued to be out of the parents' custody for at least twelve months, and despite meaningful efforts by DHS to rehabilitate the parents and correct the conditions that caused removal, those conditions have not been remedied.[21] "Dependent-neglected juvenile" is defined to include any juvenile who is at substantial risk of serious harm as a result of neglect[22] or parental unfitness.[23] "Neglect" is defined to include those acts or omissions of a parent that constitute:

> (ii) Failure or refusal to provide the necessary food, clothing, shelter, or medical treatment necessary for the juvenile's well-being; [or][24]
> . . . .

---

[21]*Morton v. Ark. Dep't of Human Servs.*, 2015 Ark. App. 388, at 7, 465 S.W.3d 871, 875 (citing Ark. Code Ann. § 9-27-341(b)(3)(B)(i)(*a*) (Supp. 2011)).

[22]Ark. Code Ann. § 9-27-303(18)(A)(v) (Repl. 2015).

[23]Ark. Code Ann. § 9-27-303(18)(A)(vi).

[24]Ark. Code Ann. § 9-27-303(36)(A)(ii). This court notes that there is an inapplicable exception here.

SLIP OPINION

(iv) Failure or irremediable inability to provide for the essential and necessary physical, mental, or emotional needs of the juvenile, including failure to provide a shelter that does not pose a risk to the health or safety of the juvenile[.][25]

The circuit court's December 8, 2015 adjudication and disposition order, adjudicated

E.H. dependent–neglected, "as defined in the Arkansas Juvenile Code." It specifically found

that:

> [E.H.] failed to gain much weight in the seven weeks after she was born due to the *failure by [appellant] to properly feed* her child and the baby's life was in danger due to lack of food. Dr. Sara Roberson, the family doctor who examined [E.H.] testified that [E.H.] failed to gain much through three check-ups at her clinic *despite [Dr. Roberson and her nurses discussing with [appellant] how to* properly feed the baby. After those three visits, Dr. Roberson diagnosed [E.H.] with failure to thrive after having concerns with [appellant's] ability to feed her baby. . . . Through observation and testing, Dr. Roberson found no other medical reasons for [E.H.'s] failure to gain weight other than improper feeding. Holly [Laird] testified she also had concerns with [E.H.'s] weight and with [appellant's] feeding of [E.H.] *even though they instructed [appellant] multiple times on how to* properly feed [E.H.] FSW Jennifer Williams testified that on October 14th, she met with [appellant] and [E.H.] at their home and asked [appellant] to make a bottle. [Appellant] made a bottle but shorted it a full scoop. . . . The Court finds Dr. Sara Robinson, Holly Laird, and FSW Jennifer Williams' testimony credible.[26]

It is clear from the circuit court's order that the reason for E.H.'s removal was the acts and

omissions of appellant which led to E.H.'s failure to thrive and which gave rise to concerns

regarding her ability to care for E.H., even when properly instructed. DHS listed the

following as services provided to appellant:

> [S]he was offered and provided with one-on-one parenting and homemaking services; arrangements were made for her to receive instruction at the Extension office in Waldron; [DHS] helped her with the admissions process to Polk County Developmental Services – Adult Services; she was provided with psychological testing and counseling; she was provided with transportation to and from instruction at the Literacy Council; she was provided with psychological testing and counseling; she was provided with family visitation, home visits, Family Centered Meetings and

---

[25]Ark. Code Ann. § 9–27–303(36)(A)(iv).

[26](Emphasis added.)

a trial home placement in which [appellant's] mother agreed to provide additional assistance as needed.

Despite these services, termination-hearing testimony showed that appellant still was not showing an ability to properly apply instructions. She still was unable to recognize safety hazards. Additionally, she was unable to successfully treat E.H.'s "continuous diaper rash," could not mix a proper bottle of formula, and could not provide proper instructions for medication usage. It was not only clear that she could not follow instructions, but also that she had to be instructed to make basic parenting decisions. Her inability to conform to the requirements of parenting—in addition to the failure of Tolleson to properly supervise appellant—led to an unsuccessful trial home placement.

These continued displays of appellant's inability to follow through and successfully apply instructions exemplify Dr. Spray's psychological-evaluation findings that appellant had low cognitive function and could not care for E.H. without supervision. Holland testified that she would come up with a plan with appellant but appellant would "never follow through." Appellant's own testimony was that she was capable of caring for E.H. with the help of others; she never asserted that she could, or would ever be able to, do it alone. Finally, she admitted that Tolleson was not a good helper to her. The statute requires that "the conditions that caused removal" be remedied, not just the named basis for the dependency-neglect adjudication.[27]

---

[27]*Rodgers v. Ark. Dep't of Human Servs.*, 2016 Ark. App. 569, at 11, 506 S.W.3d 907, 914.

After fifteen months of services, the circuit court was still concerned that appellant had not reached a point where she could safely parent E.H. Even full compliance with the case plan is not a bar to termination of parental rights; the issue is whether the parent has become a stable, safe parent able to care for his or her children.[28] Appellant's continued inability to apply instructions showcased a continued failure, refusal, or irremediable inability to make proper decisions for E.H.'s benefit. Accordingly, this court holds that the evidence shows that appellant failed to remedy the cause of E.H.'s removal, which was neglect.

IV.  *Other Subsequent Factors*

Appellant's second argument is that the circuit court erred in finding that DHS had shown the subsequent factors ground because DHS did not make reasonable accommodations in accordance with the ADA. This court has stated that the requirement that DHS make reasonable accommodations for a disability is not an overarching mandate applicable to all grounds for termination, but instead is one of the elements contained only in the "other factors" ground.[29] [30] Because we find that the circuit court did not err in terminating appellant's rights pursuant to the failure-to-remedy ground, and only one

---

[28]*Bean v. Ark. Dep't of Human Servs.*, 2017 Ark. App. 77, at 24, 513 S.W.3d 859, 874 (citing *Villasaldo v. Ark. Dep't of Human Servs.*, 2014 Ark. App. 465, 441 S.W.3d 62).

[29]*Bane v. Ark. Dep't of Human Servs.*, 2016 Ark. App. 617, at 10, 509 S.W.3d 647, 654 (citing *Anderson v. Ark. Dep't of Human Servs.*, 2016 Ark. App. 428, 501 S.W.3d 831).

[30]This court notes DHS's argument that the ADA does not apply as a defense to a termination proceeding because it is not a service, program, or activity; however, it provides no Arkansas authority stating the same. It is axiomatic that we are not compelled to follow the holdings of other jurisdictions. *Progressive Eldercare Servs.-Chicot, Inc. v. Long*, 2014 Ark. App. 661, at 5, 449 S.W.3d 324, 327. Our courts have yet to address this argument, and we do not address it here.

ground is required to support termination of parental rights, we do not address this argument. However, we do positively note DHS's argument that appellant's argument does not contend that she did not have meaningful access to services, but that she needed the second evaluation to determine the benefit of the services she received; to determine "whether she had improved."

## V.  *Denial of Motions*

Finally, appellant argues that the circuit court erred in denying her motions for a second evaluation and continuance as untimely. DHS argues that the denial of appellant's motions for a second evaluation and continuance were made in a separate order that was not appealed, and because that order was not listed in appellant's notice of appeal, appellee's argument is waived. We agree with DHS.

Appellant's motions for a second evaluation and continuance were made on December 6, 2016. They were denied in the circuit court's February 6, 2017 status-hearing order. Because the order was not final,[31] it could not be appealed until entry of the circuit court's April 6, 2017 order. Appellant designated the termination order and the order denying her motion for reconsideration in her notice of appeal. While a termination order might bring up all intermediate orders, appellant did not designate the February 6, 2017 order; therefore, she effectively waived her arguments regarding the motions for a second evaluation and a continuance.[32]

---

[31] *See* footnote 11.

[32] *See Gyalog v. Ark. Dep't of Human Servs.*, 2015 Ark. App. 302, at 7, 461 S.W.3d 734, 738 (citing *Velazquez v. Ark. Dep't of Human Servs.*, 2011 Ark. App. 168, at 5) (appellant



Affirmed.

VIRDEN and KLAPPENBACH, JJ., agree.

*Brett D. Watson, Attorney at Law, PLLC*, by: *Brett D. Watson*, for appellant.

*Andrew Firth*, Office of Chief Counsel, for appellee.

*Chrestman Group, PLLC*, by: *Keith L. Chrestman*, attorney ad litem for minor children.

---

did not designate the permanency-planning order in his notice of appeal, effectively waiving his arguments related to the permanency-planning order).